943 So.2d 176 (2006)
Christopher S. HUGHES, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D05-1767.
District Court of Appeal of Florida, Third District.
July 12, 2006.
Rehearing and Rehearing Denied December 22, 2006.
*182 Jeffrey L. Freeman, Miami Beach, and James K. Rubin, North Miami Beach, for appellant.
Charles J. Crist, Jr., Attorney General, and Paulette R. Taylor, Assistant Attorney General, for appellees.
Before SUAREZ and ROTHENBERG, JJ., and SCHWARTZ, Senior Judge.
Rehearing and Rehearing En Banc Denied December 22, 2006.
ROTHENBERG, Judge.
Christopher Scott Hughes ("Hughes"), a pilot for a commercial airline, and Thomas Porter Cloyd ("Cloyd"), a copilot for the same airline, were criminally prosecuted as codefendants and convicted of operating an aircraft while intoxicated or in a careless or reckless manner, in violation of section 860.13, Florida Statutes (2002). As Hughes and Cloyd have filed separate appeals, we have reviewed each separately. After a careful review of the record and the issues raised by Hughes, we affirm, and this opinion reflects our findings as to Hughes.

THE EVIDENCE
A brief review of the evidence is as follows. Hughes and Cloyd were scheduled to fly a commercial aircraft with approximately 125 passengers onboard, from Miami International Airport to Phoenix, Arizona, at 10:38 a.m., on July 1, 2002. Less than forty minutes prior to departure, Cloyd attempted to pass through an airport security checkpoint, carrying a cup of coffee. When security personnel stopped him and informed him that he could not pass through with the coffee, Cloyd became belligerent, demanded to see the regulations which prohibited the conduct, and used profanity. He did eventually dispose of the coffee. Meanwhile, when Hughes passed through the checkpoint, security personnel noticed an odor of an alcoholic beverage coming from Hughes, and asked him if he had been drinking. Hughes denied that he had been drinking. Security personnel allowed the defendants to continue to their gate, but reported their observations to the Transportation Security Administration *183 ("TSA") and the defendants' airline. The TSA notified the Miami-Dade Police Department, and a number of police officers who worked at the airport responded. When they arrived, the defendants were in the cockpit of the aircraft, the jet way had been pulled back from the aircraft, and the aircraft was connected to the tug that pushes it out from the gate. The officers stopped the aircraft by ordering the tug driver to return the aircraft to the gate.
Sergeant Steve Leibowitz, who conducted an examination of the defendants, noticed that each had a flushed face, bloodshot eyes, and the odor of an alcoholic beverage on his breath. Based upon his observations, Sergeant Leibowitz performed a horizontal gaze nystagmus test ("HGN test") on each of the defendants, and testified that the HGN tests indicated that each was impaired, with an estimated breath alcohol level of approximately .10 percent. He, therefore, arranged for the defendants to be transported to the police station for further testing.
Officer Harold Ruffner, who conducted a breath test of the defendants at the station, testified that Cloyd's first breath result was .1091 and his second was .09; while Hughes' readings were .084 and .081. H. Chip Wells, a forensic toxicologist, testified that, based upon the lowest of Cloyd's breathalyzer test results, he calculated through retrograde extrapolation that Cloyd's breath alcohol content was between .121 and .15; and that, based upon Hughes' lowest breathalyzer result, Hughes' breath alcohol content was between .113 and .145, when they were onboard the aircraft.
In addition to the observations of the security personnel and law enforcement, the results of the HGN tests, the breathalyzer results, and the forensic toxicologist's expert opinion regarding the defendants' breath alcohol at the time they were onboard the aircraft, the State introduced the defendants' bar tab from the night before, a videotape of them at the bar being served, and the testimony of witnesses. This evidence corroborated the observations and test results regarding the defendants' consumption of alcohol. The night before this scheduled flight, the defendants shared a bottle of wine with two crew members at dinner, and each of the defendants also drank a martini. From the restaurant, they proceeded to Mr. Moe's Restaurant and Bar ("Moe's") where they opened a bar tab at approximately 10:49 p.m. From 10:49 at night until after 5:00 the next morning, they drank at Moe's, ordering seven 34-ounce mugs of beer, eight 16-ounce mugs of beer, a martini, and a burger. The two crew members, who were with the defendants, consumed one 16-ounce beer, the martini, and the burger, and left before midnight. The videotape showed the defendants continuously drinking throughout the night, and leaving just after 5:00 a.m., with the remainder of their beers, which they poured into a plastic cup carried by Cloyd. The evidence also established that Cloyd, Hughes, and the crew arrived at the airport late because Hughes had overslept.
Over defense objection, the State elicited testimony regarding the .08 blood alcohol limitation for operating a motor vehicle contained in section 316.193, Florida Statutes, even though the statute Cloyd and Hughes were charged with violating, section 360.13, contains no such limitation. Also, over defense objection, the State's witnesses were permitted to discuss the .04 civil standard contained in the federal aviation regulations, whereas the defense was precluded from introducing the .10 presumption of impairment contained in the federal criminal code, 18 U.S.C. § 343 (1988).
*184 Whether the defendants were operating the aircraft before the police intervened was a matter hotly disputed at trial. The State's commercial aviation expert testified that he considered the pilots to be operating the aircraft when they activated and checked systems prior to departure, and he testified as to the extensive preflight inspections and systems checks that the pilots were required to complete. The pilots must enter critical data into the aircraft's computer, including the flight plan of the route, performance data, takeoff speeds, fuel load, and radio configurations for the navigation radio. The information entered into the computer is then displayed in the cockpit for the pilots to refer to when flying the aircraft. The aviation expert testified that he would consider it careless and reckless to perform any of these functions while under the influence of alcohol because they are critical for safety. He testified that the captain gives permission to the tug to begin the push back of the aircraft, and that, although the driver of the tug is physically controlling the movement of the aircraft at that point, the captain is in actual control of the aircraft.
The driver of the tug testified that once the aircraft is hooked up to the tug, he has control of the aircraft; to his knowledge the pilot cannot steer the aircraft; and its engines are not on. He did admit, however, on cross-examination, that, when he is operating the tug, he has to wear a headset to communicate with the pilot and copilot, and cannot begin the push back until the pilot instructs him to do so.
The defendants moved for a judgment of acquittal, arguing that the evidence demonstrated that they did not operate or control the aircraft. The trial court denied their motions. The defendants requested a jury instruction on "inoperability," arguing that the evidence established that the aircraft could not be flown while it was attached to the tug. Cloyd, but not Hughes, additionally requested that the court instruct the jury on attempt. Both requests were denied by the trial court. Over the defendants' objections, the court granted the State's request for an instruction on principals.
In closing argument, the State argued, over defense objection, that the defendants could be found guilty of violating section 860.13 under two separate theories: (1) by being under the influence of an alcoholic beverage or (2) by operating the aircraft in a careless or reckless manner. The State told the jury that it could find the defendants guilty even if it did not have unanimity regarding the specific theory of prosecution. The defendants moved for mistrial or, in the alternative, requested a specific instruction, requiring a unanimous verdict as to the theory upon which their verdict was based, and requested that the jury be given a special verdict form in order to identify its verdict as to each of the two theories of prosecution. The trial court denied these motions. The jury returned a guilty verdict, and the defendants were sentenced.

PREEMPTION
The first issue we address in this appeal is whether the trial court erred in denying Hughes' motion to dismiss for lack of jurisdiction. It is Hughes' position that the federal government has preempted all state action regarding the physical qualifications and capacity of a federally certified pilot. Prior to trial, the defendants moved to dismiss the charges based upon federal preemption. When the trial court denied the motion, and the defendants sought review with this court by filing a petition for writ of prohibition, this court denied the writ without opinion, and the defendants petitioned the federal court for a writ of *185 habeas corpus. The United States District Court for the Southern District of Florida granted the petition, finding that the state action was preempted. Hughes v. Eleventh Judicial Circuit of Fla., 274 F.Supp.2d 1334 (S.D.Fla.2003). On appeal, the Eleventh Circuit Court of Appeals reversed the district court's opinion, and held that the district court should have abstained from hearing the claim because the defendants' preemption claim was not facially conclusive. Hughes v. Attorney Gen. of Fla., 377 F.3d 1258 (11th Cir.2004), cert. denied, 543 U.S. 1051, 125 S.Ct. 881, 160 L.Ed.2d 772 (2005).
Based upon controlling case law in our district, we conclude that this claim is barred by res judicata. At the time when the defendants filed their petition and we issued our mandate denying the petition on January 9, 2003, a denial of a petition for a writ of prohibition in our district was a ruling on the merits, unless otherwise indicated. See Obanion v. State, 496 So.2d 977, 980 (Fla. 3d DCA 1986), abrogated by Topps v. State, 865 So.2d 1253, 1258 (Fla. 2004). Because the preemption issue was already decided against the defendants on the merits, they are barred by res judicata from relitigating the claim. Denson v. State, 775 So.2d 288, 290 n. 3 (Fla.2000) ("The doctrine of res judicata provides that a final judgment on the merits is conclusive of the rights of the parties and constitutes a bar to a subsequent action or suit involving the same cause of action or subject matter.").
While we conclude that the preemption issue is barred by res judicata, had the issue not been barred, we would have found, as did our sister court to the north, that the defendants' prosecutions were not preempted. Gluhareff v. State, 888 So.2d 733 (Fla. 5th DCA 2004) (determining that section 860.13 is not preempted by federal law). Under the Supremacy Clause of the United States Constitution, the federal government has the power to preempt state criminal laws, and if state law conflicts with federal law, the state law must "yield." See State v. Stepansky, 761 So.2d 1027, 1030-31 (Fla.2000). There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. E.I. Du Pont de Nemours & Co. v. Aquamar S.A., 881 So.2d 1, 4 n. 3 (Fla. 4th DCA 2004). Express preemption is when the language of the federal statute explicitly demonstrates Congress' intent to preempt state law. Field preemption applies when federal regulation in a legislative field is so pervasive, that Congress left no room for the states to supplement it. Conflict preemption occurs when it is impossible to comply with both federal and state law, or when state law stands as an obstacle to the objectives of federal law. Id.; State v. Harden, 873 So.2d 352, 354 (Fla. 3d DCA 2004).
In conducting a preemption analysis in areas traditionally regulated by the states, there is a presumption against preemption. California v. ARC Am. Corp., 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) ("When Congress legislates in a field traditionally occupied by the States, `we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'") (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Thus, because criminal law is an area traditionally regulated by the states, the defendants have the burden of overcoming the presumption against preemption. Id.; Air Line Pilots Ass'n, Int'l v. UAL Corp., 874 F.2d 439 (7th Cir.1989); State v. Klinakis, 206 Ga.App. 318, 425 S.E.2d 665, 669 (1992).
*186 Hughes argues that his prosecution is expressly preempted by 14 C.F.R. 121 App. I, § XI, which provides, in part, that any state law covering the subject matter of 14 C.F.R. Parts 65, 121, and 135, including drug testing, is preempted. We find that section 860.13, Florida Statutes, criminalizing the operation of an aircraft while under the influence or in a careless or reckless manner, does not cover the subject matter of the specified Parts. As explained by the Eleventh Circuit Court of Appeals, "[t]hose Parts deal with certification and operating requirements of various designated airline employees," such as the drug testing requirements imposed upon such employees. Hughes v. Attorney Gen. of Fla., 377 F.3d 1258, 1273 (11th Cir. 2004), cert. denied, 543 U.S. 1051, 125 S.Ct. 881, 160 L.Ed.2d 772 (2005). However, unlike the Parts of the Code of Federal Regulations specified above, section 860.13 does not impose certification or operating requirements upon airline employees. Rather, it regulates the conduct of persons operating aircrafts. There is no language in 14 C.F.R. § 121 App. I, § XI or any other federal source stating that state criminal statutes regulating the conduct of those operating aircrafts are preempted. Therefore, 14 C.F.R. § 121 App. I, § XI does not expressly preempt this action.
Hughes argues that his prosecution is expressly preempted by 49 U.S.C. § 41713(b). This section is a part of the Federal Aviation Act, as amended by the Airline Deregulation Act. We find that this section does not expressly preempt state action either. The purpose of the Airline Deregulation Act was to deregulate the airline industry, while promoting not only lower prices, but higher quality, efficiency, and innovation. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). Since Congress did not want the states to interfere with those goals, it expressly preempted state laws or regulations related to price, route, and services of an air carrier. 49 U.S.C. § 41713(b); Morales, 504 U.S. at 378, 112 S.Ct. 2031. It did not include, however, a preemption of the criminal conduct of the crew. In fact, the Federal Aviation Act, as amended by the Airline Deregulation Act, does not provide for any criminal penalties for crew members operating an aircraft under the influence. While there are federal statutes criminalizing such conduct, 18 U.S.C. §§ 341-343 (2000), they are not a part of the federal aviation legislation or any statutory scheme dealing specifically with the airline industry. Rather, they are contained in the general criminal section of the Federal Code, and were enacted as a part of the Anti-Drug Abuse Act of 1986. We conclude that if Congress intended for section 41713(b) of the United States Code to preempt state law regarding criminal conduct, it could have expressly stated so as it did in regard to other areas.
In the alternative, Hughes argues that field preemption bars his prosecution because the federal government, through the Federal Aviation Administration ("FAA"), has issued pervasive regulations that preempt interference in the subject area of the qualifications and capacity of airmen to pilot aircraft in interstate commercial air transportation. We disagree. First, we note that field preemption should not be inferred "simply because [an] agency's regulations are comprehensive." R.J. Reynolds Tobacco Co. v. Durham County, N.C., 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986); Hughes, 377 F.3d at 1267. Secondly, we find, as did the Eleventh Circuit Court of Appeals, that the existence of 14 C.F.R. § 91.17(c) "severely undercuts [the] argument that the challenged Florida criminal statutes are preempted." Hughes, 377 *187 F.3d at 1268. Section 91.17(c) of the Code of Federal Regulations provides:
(c) A crewmember shall do the following:
(1) On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when 
(i) The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
(ii) The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1) [operating an aircraft within eight hours of consuming alcohol], (a)(2) [operating an aircraft while under the influence of alcohol], or (a)(4) [operating an aircraft while having a .04 percent or more blood alcohol level] of this section.
14 C.F.R. § 91.17(c). This section clearly allows states to investigate violations of their laws which make it illegal to pilot an aircraft while intoxicated, and may specifically do so when the state law prohibits conduct that is the same or is substantially similar to the conduct that is prohibited by a federal regulation. By allowing the investigation of a state law violation, it also clearly implies that such laws, once violated, may be prosecuted and are, therefore, not preempted.
Hughes' final preemption argument is that his prosecution is barred by conflict preemption. We disagree because a pilot could comply with both the Florida law and the federal law and regulations, and criminalizing the operation of an aircraft while intoxicated does not stand as an obstacle to the federal regulatory scheme. Hughes, 377 F.3d at 1266 n. 11.

CONSTITUTIONAL CHALLENGES
Hughes claims that section 860.13, Florida Statutes (2002), is unconstitutional (1) due to vagueness and (2) because it incorporates federal standards.
Vagueness Challenge
Hughes claims that the statute is unconstitutionally vague as it fails to define "under the influence" and "operate." He argues that the failure to define these terms denies a man of ordinary understanding the ability to determine what action is proscribed. By way of example, he argues that a person who consumes one alcoholic beverage and operates an emergency door on the aircraft, could be subject to this statute.
We begin our review and analysis with the presumption that the statute is constitutional, see Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d 250 (Fla. 2005); Fla. Dep't of Educ. v. Glasser, 622 So.2d 944, 946 (Fla.1993), and that "courts have the judicial obligation to sustain legislative enactments when possible." State v. Williams, 343 So.2d 35, 37 (Fla.1977).
A constitutional challenge as to vagueness is based upon procedural due process, whether the statute provides fair notice, measured by common practice and understanding, as to the conduct which is prohibited. Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Hermanson v. State, 604 So.2d 775 (Fla.1992). To raise a vagueness challenge, the defendant must demonstrate that the statute in question lacks specificity as to his own actions, as opposed to some hypothetical situation, State v. Normandale Props., 420 N.W.2d 259 (Minn.Ct. App.1988), or "on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." New York v. Ferber, 458 U.S. 747, *188 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (citing Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)); see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); Sieniarecki v. State, 756 So.2d 68, 75 (Fla.2000) (defendant lacked standing to raise facial vagueness challenge where his conduct fell within the statute's proscription); McKenney v. State, 388 So.2d 1232, 1233 (Fla.1980) ("A person whose conduct clearly falls within the statute's prohibition cannot reasonably be said to have been denied adequate notice. . . . ").
After reviewing the evidence presented at trial, we conclude that Hughes lacks the requisite standing to challenge the statute on vagueness grounds since his conduct clearly falls within the conduct proscribed in section 860.13, and that Hughes, who is a person of at least ordinary intelligence, should have had no difficulty in knowing that his conduct was violative of section 860.13.
Section 860.13 is entitled "Operation of aircraft while intoxicated or in careless or reckless manner" and provides that it is unlawful to operate an aircraft in the air or on the ground while under the influence of alcoholic beverages or in a careless or reckless manner so as to endanger the life or property of another. The evidence presented at trial was that Hughes, knowing that he was scheduled to fly a commercial aircraft at 10:38 a.m. and required to board the aircraft forty-five minutes prior to departure (9:53 a.m.), and upon boarding, he was required to conduct a lengthy, detailed preflight procedure critical to the safety of the flight, the crew, and passengers, began drinking the evening before the flight, and continued to drink throughout the night and until 5:00 in the morning. He began with a martini and wine with dinner, and between he and the copilot, Cloyd, drank seven 34-ounce and seven 16-ounce mugs of beer. After drinking all night, Hughes returned to his hotel room at 5:30 a.m., overslept, causing him and the crew to arrive late at the airport. Based upon the HGN test conducted by Sergeant Leibowitz shortly after the aircraft was pushed back from the gate and cleared for departure, Sergeant Leibowitz estimated that Hughes' blood alcohol level was at least .10. The breath test subsequently performed placed Hughes' blood alcohol level at between .113 and .145 at the time Hughes was onboard the aircraft performing his preflight inspections, and safety checks, entering critical data in the aircraft's computer, computing takeoff speeds, fuel load, and radio configurations, and communicating with the tower and the tug.
We, therefore, agree with the State, that Hughes' conduct is clearly prohibited by section 860.13 and that he "cannot seriously contend that [he][was] not on notice that [his] conduct was illegal." This is especially true given the fact that commercial airline pilots operate in a highly regulated industry where there is zero tolerance for alcohol in the cockpit. See Johnson v. Nat'l Transp. Safety Bd., 979 F.2d 618 (7th Cir.1992) (upholding the revocation of Johnson's commercial pilot certificate for allowing his intoxicated copilot to fly the aircraft); 14 C.F.R § 91.11 (1999)(federal aeronautics safety regulation which prohibits any crewmember from serving as a crewmember with a .04 blood alcohol level or within eight hours of having consumed any alcohol). While we conclude that the statute, as applied to Hughes and under the facts of this case, is not unconstitutionally vague, and that Hughes, therefore, *189 lacks standing to facially attack the statute on vagueness grounds, we will nevertheless extend our analysis to address the merits of his claim.
Hughes argues that the statute is unconstitutionally vague as it fails to define the terms "operate" and "under the influence." We disagree. The plain and ordinary meaning of a word can be ascertained by reference to a dictionary, Sieniarecki, 756 So.2d at 75, or one may look to "`case law or related statutory provisions which define the term.'" State v. Fuchs, 769 So.2d 1006, 1008 (Fla.2000) (quoting State v. Hagan, 387 So.2d 943, 945 (Fla. 1980)). Section 860.13(2) provides:
In any prosecution charging careless or reckless operation of aircraft in violation of this section, the court, in determining whether the operation was careless or reckless, shall consider the standards for safe operation of aircraft as prescribed by federal statutes or regulations governing aeronautics.
As the statute itself incorporates the federal regulations and statutes governing aeronautics in determining what constitutes careless or reckless operation of an aircraft, we have reviewed both the dictionary definition of "operate" and the federal definition.
"Operate" is defined as "[t]o run or control the functioning of." The American Heritage Dictionary of the English Language 1233 (4th ed. 2000). The FAA is charged with the responsibility of promoting air safety and has established various regulations regulating the airline industry and the conduct of pilots. The federal regulations governing aeronautics defines "operate" as follows:
Operate, with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in § 91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).
14 C.F.R. § 1.1 (1997).
Although Hughes did not fly the aircraft, the evidence established that he did "control the functioning of" the aircraft, and did "use, cause to use or authorize to use [the] aircraft, for the purpose . . . of air navigation." He conducted extensive preflight inspections and systems checks, and inputted critical data into the aircraft computer with the intent ("for the purpose . . . of") to fly the passengers and crew from Miami to Phoenix ("air navigation"). As his onboard preflight activities clearly fall within both the dictionary definition and the definition of "operate" contained in the federal regulations, and the jury was provided with the definition of "operate" contained in the Code of Federal Regulations, we reject Hughes' constitutional challenge of the statute based upon the failure of the statute to specifically define "operate."
We likewise reject Hughes' constitutional challenge based upon the statute's failure to define "under the influence," as his conduct, which we have previously addressed, is clearly prohibited under the statute. "The standard for testing vagueness under Florida law is whether the statute gives a person of ordinary intelligence fair notice of what constitutes forbidden conduct." Brown v. State, 629 So.2d 841, 842 (Fla.1994). "A person whose conduct clearly falls within [a] statute's prohibition cannot reasonably be said to have been denied adequate notice. . . ." McKenney v. State, 388 So.2d 1232, 1233 (Fla.1980).
Incorporation Challenge
Hughes additionally argues that section 860.13(2) unconstitutionally incorporates federal regulations that did not *190 exist at the time that the statute was enacted. Article II, section 3 of the Florida Constitution provides that no person belonging to one branch of the government may exercise any power belonging to the other branches. Because the legislature has the sole authority and responsibility to make laws, this provision has been construed to prohibit the legislature from delegating its power to others. Gallagher v. Motors Ins. Corp., 605 So.2d 62, 71 (Fla. 1992); Adoue v. State, 408 So.2d 567, 570 (Fla.1981). Therefore, although the legislature may adopt or incorporate regulatory and statutory standards existing at the time of the adoption, any attempt to adopt or incorporate standards that will arise in the future is unconstitutional as an improper delegation of legislative power. Adoue, 408 So.2d at 570; State v. Carswell, 557 So.2d 183, 184 (Fla. 3d DCA 1990).
Section 860.13 was last reenacted without any amendments in 1983. Thus, incorporation of a federal standard that did not come into existence until after 1983, would be unconstitutional. Section 860.13(2) provides:
In any prosecution charging careless or reckless operation of aircraft in violation of this section, the court, in determining whether the operation was careless or reckless, shall consider the standards for safe operation of aircraft as prescribed by federal statutes or regulations governing aeronautics.
In Carswell, we found that section 860.13(2) does incorporate the federal standards for the safe operations of aircraft. Carswell, 557 So.2d at 184. As it was undisputed in Carswell that the federal standards relied upon in that case existed at the time of section 860.13's enactment, we concluded that there was no improper delegation of legislative power. Id. In the instant case, however, the parties dispute whether the federal standards relied upon in this case existed at the time that section 860.13 was reenacted in 1983. The federal standards referred to in the instant case are found in 14 C.F.R. § 91.17(a), which prohibit a crewmember from acting in that capacity within eight hours of consuming any alcoholic beverage or with a blood alcohol level of .04 percent or higher. In 1983, the federal regulations clearly prohibited acting as a crewmember within eight hours of consuming alcohol. See 14 C.F.R. § 91.11. However, the prohibition against acting as a crewmember with a blood alcohol level of .04 percent or higher, did not exist in 1983. Thus, for section 860.13(2) to adopt and include the federal regulation prohibiting acting as a crew member with a blood alcohol level of .04 percent or higher, would constitute an unconstitutional delegation of legislative power. Because we must construe statutes in a manner so as to uphold their constitutionality, we interpret section 860.13(2) to incorporate only those federal aeronautic safety regulations that existed in 1983. As we conclude that section 860.13(2) cannot and, therefore, does not incorporate the federal .04 percent blood alcohol standard, we deny Hughes' constitutional challenge on that ground.

EVIDENTIARY ISSUES
Admission at Trial of Federal Aviation Regulations
Over defense objection, the trial court permitted the State to introduce evidence that, pursuant to federal regulations for the safe operation of an aircraft, a crewmember is prohibited from operating an aircraft within eight hours of consuming any alcoholic beverages, or with a blood alcohol level of .04 or above. As section 860.13(2) specifically provides that the court shall consider federal regulations governing aeronautics in determining whether the operation of the aircraft was *191 done in a careless or reckless manner, and the prohibition against operating an aircraft within eight hours of consuming any alcoholic beverage, which is found in 14 C.F.R. § 91.17(a), was in existence when section 860.13(2) was reenacted in 1983, we conclude that the trial court properly allowed the introduction of this evidence. We, however, agree with Hughes that the trial court erred in allowing the State to introduce evidence that under these same regulations, a crewmember is prohibited from operating an aircraft with a blood alcohol level of .04 percent or above, as this regulation was not in existence when section 860.13 was reenacted. Based upon our review of the evidence and the focus of the State's closing argument, we, however, find that the error was harmless beyond a reasonable doubt. See Smith v. State, 888 So.2d 112 (Fla. 3d DCA 2004) (applying the harmless beyond a reasonable doubt standard where an employee manual was improperly introduced to establish defendant's guilt as to grand theft).
A review of the record reflects that the State focused on Hughes' actions, not on federal regulations. The State argued that it had proven its case based upon the following. When Hughes arrived for the 10:38 a.m. flight, he was late, smelled of alcoholic beverages, had bloodshot eyes and a flushed face, but denied that he had been drinking. The evidence established that he had consumed a martini and wine with dinner and continued to drink all night with the copilot. Together they consumed seven 34-ounce and seven 16-ounce mugs of beer, drinking until at least 5:00 a.m., despite being required to begin preflight operations before 10:00 that morning for a commercial flight carrying over 100 passengers. In support of the State's claim that Hughes appeared to be under the influence and that he had in fact consumed as much alcohol and as late as the evidence suggested, the State relied on the results of the HGN test, which placed Hughes' blood alcohol level at, at least, .10; the subsequent breath test results, which placed his blood alcohol level at between .113 and .145 when he was operating the aircraft; Hughes' admission that he had consumed "many" beers throughout the night; and the expert's testimony that Hughes' ability to operate the critical systems of the aircraft would be impaired at these levels. As the State did not place any emphasis on the improperly admitted evidence, and the evidence establishing that Hughes operated the aircraft under the influence of alcoholic beverages and/or in a careless or reckless manner so as to endanger the lives of those aboard the aircraft was overwhelming, we conclude that the improperly introduced evidence was harmless beyond a reasonable doubt.[1]
Failure to Admit the .10 Federal Criminal Presumption
While Hughes claims that the trial court erred when it precluded him from introducing evidence that, under the federal law criminalizing the operation of a common carrier under the influence of alcohol, the presumption of intoxication is .10, we reject this argument on the same basis wherein we concluded that the federal regulation prohibiting operation of an aircraft with a blood alcohol level of .04 was inadmissible. The federal statutes in question, 18 U.S.C. §§ 342-43 (2000), was not created until 1986. See Pub. L. 99-570, Title I, *192 § 1971(a), Oct. 27, 1986, 100 State. 3207-59. This federal statute, therefore, could not have been adopted by the Florida Legislature when it reenacted section 860.13 in 1983 and, thus, was not admissible. Adoue, 408 So.2d at 570; Carswell, 557 So.2d at 184. Furthermore, section 860.13(2) requires the court to consider the "standards for safe operation of aircraft as prescribed by federal statutes or regulations governing aeronautics." The .10 presumption of intoxication is not relevant as to whether Hughes was operating the aircraft under the influence or in a careless or reckless manner. They are entirely different standards. The trial court, therefore, did not abuse its discretion in denying the introduction of the federal criminal intoxication presumption.
Admission of Tharpe's Equation
Hughes contends that the trial court erred in permitting Sergeant Leibowitz to rely on the Tharpe's Equation after performing the HGN test in estimating Hughes' blood alcohol level, without conducting a Frye analysis to determine its validity. The HGN test evaluates the ability of the eye to track a moving object smoothly. See Williams v. State, 710 So.2d 24, 29 n. 7 (Fla. 3d DCA 1998). The Tharpe's Equation is the formula used to correlate a blood alcohol level based upon the angle of onset of the observed nystagmus, which is when the eye begins to "jerk" while trying to follow an object.
In Williams, we took judicial notice that HGN test results are generally accepted as reliable in the relevant scientific community and therefore, the requirements of Frye were satisfied. Williams, 710 So.2d at 32. Once a proper foundation is laid that the test was correctly administered by an officer properly trained and qualified to administer the test, the results are admissible. Id.; see also Bowen v. State, 745 So.2d 1108 (Fla. 3d DCA 1999).
Use of Beer Mugs as Demonstrative Evidence
Hughes additionally objects to the State's use of fourteen beer mugs as demonstrative evidence of the number and size of the beers reflected on Hughes' and Cloyd's bar tab, as none of the witnesses could testify that Hughes and Cloyd drank all of the beer contained on their tab. "`Demonstrative evidence is admissible only when it is relevant to the issues in the case. Such evidence is generally more effective than a description given by a witness, for it enables the jury, or the court, to see and thereby better understand the question or issue involved.'" Harris v. State, 843 So.2d 856, 863 (Fla. 2003) (quoting Alston v. Shiver, 105 So.2d 785, 791 (Fla.1958)). The number and size of the beers reflected on the bar tab was relevant as to the amount of beer Hughes and Cloyd had consumed that night and was supported by their blood alcohol levels the following morning onboard the aircraft. While there was no witness who actually observed exactly how many mugs of beer each drank, that fact goes to the weight, not the admissibility of the evidence. As the demonstrative evidence was relevant and supported by competent substantial evidence, we find no abuse of discretion in its use.

JURY INSTRUCTIONS
Inoperability
Hughes argues that, because the aircraft was attached to a tug which controlled the movement of the aircraft, the trial court erred in rejecting his request for a jury instruction on inoperability. Inoperability is a defense to driving a motor vehicle under the influence, pursuant to section 316.193, Florida Statutes (2002).
*193 Section 316.193, the driving under the influence statute, provides that, before a person may be found guilty of this offense, the State must prove the following two elements beyond a reasonable doubt:
1. That the defendant drove or was in actual physical control of a vehicle, and
2. While driving or in actual physical control of the vehicle the defendant
a. was under the influence of [alcoholic beverages][a chemical substance][a controlled substance] to the extent that [his][her] normal faculties were impaired, or
b. had a blood-alcohol level of 0.08 or more grams of alcohol per 100 milliliters of blood, or a breath-alcohol level of 0.08 or more grams of alcohol per 210 liters of breath.
"Actual physical control of a vehicle" means the defendant must be physically in or on the vehicle and have the capability to operate the vehicle, regardless of whether he/she is actually operating the vehicle at the time.
Fla. Std. Jury Instr. (Crim.) 28.1.
A defendant, therefore, may be found guilty of this offense if he/she (1) drove or is driving a vehicle while under the influence or (2) is in actual physical control of a vehicle while under the influence. While the State is not required to prove that the vehicle is capable of operation, inoperability may be a defense to whether the defendant was in actual physical control of the vehicle. Jones v. State, 510 So.2d 1147, 1149 (Fla. 1st DCA 1987); see also Standard Jury Instructions in Criminal Cases (97-2), 723 So.2d 123, 144-47 (Fla.1998). The defense of inoperability is based upon the premise that:
a person ought not be convicted of having a vehicle under his or her control while intoxicated when in fact the vehicle was inoperable, the intoxicated person did not operate the vehicle prior to its becoming disabled, and the vehicle's mechanical problems were such that it could not under any reasonable circumstances have been operated by the person accused.
Jones v. State, 510 So.2d at 1149.
Hughes, however, was not charged with violating section 316.193, the driving under the influence statute. Rather, he was charged with violating section 860.13, Florida Statutes (2002), "Operation of aircraft while intoxicated or in careless or reckless manner," which provides, in part, that:
(1) It shall be unlawful for any person:
(a) To operate an aircraft in the air or on the ground or water while under the influence of:
1. Alcoholic beverages;
2. Any substance controlled under chapter 893;
3. Any chemical substance set forth in s. 877.111; or
(b) To operate an aircraft in the air or on the ground or water in a careless or reckless manner so as to endanger the life or property of another.
(2) In any prosecution charging careless or reckless operation of aircraft in violation of this section, the court, in determining whether the operation was careless or reckless, shall consider the standards for safe operation of aircraft as prescribed by federal statutes or regulations governing aeronautics.
§ 860.13, Fla. Stat. (2002). Since the statute itself requires that the federal statutes and regulations governing aeronautics be considered in determining whether the operation of the aircraft was careless or reckless, the trial court relied on the federal statute which defines what "operates" means with respect to an aircraft:

*194 Operate, with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in § 91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).
14 C.F.R. § 1.1 (1997).
As is readily obvious, section 860.13, the statute under which Hughes was charged and convicted, differs from section 316.193, the driving under the influence statute. The elements are not the same, nor is the proof which is required to sustain a conviction. While the driving under the influence statute, section 316.193, requires that the State prove that the accused was driving or in actual physical control of the vehicle while under the influence, the statute Hughes was charged with violating, section 860.13, requires operation of the aircraft while under the influence or in a careless or reckless manner. While operability may be a defense to the driving under the influence statute, it is an element of the crime charged pursuant to section 860.13. While the trial court must instruct the jury on the applicable law regarding a defense whenever there is evidence introduced at trial which supports that theory of defense, Hamilton v. State, 703 So.2d 1038, 1042 (Fla.1997); Bryant v. State, 412 So.2d 347, 350 (Fla. 1982), operability in this case is an element of the crime charged. As such, the jury was instructed that before it could find the defendant guilty, the State was required to prove beyond a reasonable doubt that the defendant operated the aircraft, and the trial court also instructed the jury as to the definition of "operate" with respect to an aircraft.
"[A] trial court has wide discretion in instructing the jury, and the court's decision regarding the charge to the jury is reviewed with a presumption of correctness on appeal," Carpenter v. State, 785 So.2d 1182, 1199-1200 (Fla.2001), which will not be disturbed on appeal "unless palpable abuse of this discretion is clearly shown from the record." Williams v. State, 437 So.2d 133, 136 (Fla.1983). The trial court is not required to provide additional instructions if the instructions given are adequate or when a requested instruction would only serve to confuse the jury. See Carpenter, 785 So.2d at 1200; Doyle v. State, 483 So.2d 89, 90 (Fla. 4th DCA 1986).
Because "operate" is an element of the crime charged and that term was defined, we find that the trial court did not err in failing to instruct the jury on "inoperability." Additionally, as actual physical control only requires that the vehicle, which in this case is an aircraft, be reasonably capable of being rendered operable, not that the defendant have the immediate ability to operate the vehicle, the trial court did not err by failing to provide the requested instruction.
A review of the case law reveals that the "reasonably capable of being rendered operable standard" is applied when a person is charged with driving under the influence and claims either that the vehicle was not operational or that he was not in actual physical control of the vehicle. For example, if a person is found passed out behind the steering wheel of a vehicle with the keys either in the ignition or on the floor of the vehicle, he may be found guilty of violating this statute because he is in actual physical control of a vehicle which can readily be made operational. See State, Dep't of Highway Safety & Motor Vehicles v. Prue, 701 So.2d 637 (Fla. 2d DCA 1997) (conviction upheld for being in actual physical control while under the influence where a defendant was found passed out in a vehicle on the shoulder of a highway, with her face resting on the *195 steering wheel and the keys either in the ignition or on the floor of the vehicle, because she could have used the keys to start the vehicle and drive away); Baltrus v. State, 571 So.2d 75 (Fla. 4th DCA 1990) (upholding the reversal of a motion to dismiss where the defendant was found passed out and slumped over the steering wheel of his car, with the keys to the car in his hands); Fieselman v. State, 537 So.2d 603 (Fla. 3d DCA 1988) (finding that the trial court erred by dismissing a charge of being in actual physical control of a vehicle while under the influence, where the defendant was found lying down, asleep in the front seat of his automobile, with the engine off but with the keys in the ignition, explaining that the presence of the keys in the ignition led to the inference that the defendant could have started the automobile and have driven away at any time); Griffin v. State, 457 So.2d 1070, 1072 (Fla. 2d DCA 1984) (affirming a conviction based upon actual physical control where the defendant was in the driver's seat of a car that was stationary in the roadway with the keys in the ignition and the lights on, finding that, since the defendant had "placed himself behind the wheel of the vehicle and could have at any time started the automobile and driven away," he was in actual physical control of the vehicle).
In State v. Smelter, 36 Wash.App. 439, 674 P.2d 690 (1984), a case relied upon by the First District in Jones v. State, 510 So.2d 1147 (Fla. 1st DCA 1987), the court applied the "reasonably capable of being rendered operable standard" to a driving under the influence statute similar to Florida's, and concluded that the defendant was in actual physical control and, therefore, guilty of the offense, where he was found intoxicated in his car which was out of gas. The court explained that "control" means more than the ability to stop an automobile. It includes the authority to manage it. Smelter, 674 P.2d at 691-92. "Actual physical control" is the present ability to operate, move, park, or direct whatever use or non-use is to be made of the motor vehicle at the moment. Id. (citing State v. Purcell, 336 A.2d 223, 226 (Del.Super.Ct.1975)); see also State v. Starfield, 481 N.W.2d 834 (Minn.1992) (actual physical control proven where car keys were found in defendant's jacket pocket and car was stuck in a snow-filled ditch); Abeln v. Comm'r of Pub. Safety, 413 N.W.2d 546 (Minn.Ct.App.1987) (actual physical control found despite dead battery); State v. Woodward, 408 N.W.2d 927 (Minn.Ct.App.1987) (actual physical control found where vehicle had a flat tire); State v. Duemke, 352 N.W.2d 427 (Minn.Ct.App. 1984) (actual physical control where car was stuck in a snow-filled ditch).
In contrast, when a vehicle's condition renders it incapable of being operated and it cannot be readily made operable due to the necessity of making substantial mechanical repairs or other factors which reflect that the vehicle's disability is not just temporary, then physical control is not established. See Jones, 510 So.2d 1147, 1149 (Fla. 1st DCA 1987) (finding that the defendant could not be convicted of driving under the influence in light of evidence that the vehicle she was found in was inoperable, the defendant did not operate the vehicle prior to it becoming disabled, and the vehicle's mechanical problems were such that it could not, under any reasonable circumstances, have been operated where vehicle had to be pushed to an automobile repair shop and electrical problems prevented the car from running); State v. Carter, 889 S.W.2d 231, 233 (Tenn. Crim.App.1994) (finding insufficient evidence to support defendant's conviction for driving under the influence because her car was incapable of being operated without substantial mechanical repairs; experienced mechanic testified that the car was *196 "dead," could not be jump started, and could only be started if the carburetor was replaced or taken apart and thoroughly cleaned).
The rationale for applying the "reasonably capable of being rendered operable standard" is due to the recognition that the law in this area is preventive in nature. Its purpose is to deter intoxicated individuals from getting into their vehicles, except as passengers, and enables law enforcement to apprehend an intoxicated driver before he strikes.
In general, laws prohibiting driving while intoxicated are deemed remedial statutes, to be "liberally interpreted in favor of the public interest and against the private interests of the drivers involved." [State v. Juncewski, 308 N.W.2d 316, 319 (Minn.1981)]. Specifically, actual physical control statutes have been characterized as "preventive measure[s]," State v. Schuler, [243 N.W.2d 367, 370 (N.D.1976)], which "deter individuals who have been drinking intoxicating liquor from getting into their vehicles, except as passengers," State v. Ghylin, [250 N.W.2d 252, 255 (N.D.1977)], and which "enable the drunken driver to be apprehended before he strikes." State v. Webb, [78 Ariz. 8, 274 P.2d 338, 339 (1954)].
Smelter, 674 P.2d at 693. It is for these reasons that the courts in our state and in the states which have similar driving under the influence statutes have concluded that temporary inoperability does not preclude a finding of physical control, and have held "that physical control is meant to include situations where an intoxicated individual is found in a parked car under circumstances where the car, without too much difficulty, might again be started and become a source of danger to the driver, to others, or to property." State v. Hendricks, 586 N.W.2d 413, 415 (Minn.Ct.App. 1999) (citing Starfield, 481 N.W.2d at 838-39).
In the instant case, there was no evidence introduced which even suggested that the aircraft was experiencing any mechanical difficulties. Although the aircraft was not capable of moving under its own power when it was attached to the tug, the defendants easily could have rendered it capable of moving under its own power at any time by ordering the tug to be detached from the aircraft. But more importantly, whether the defendants could move the aircraft under its own power during the time it was being towed by the tug is irrelevant and, with all due respect to the defense, nothing more than a red herring. The undisputed evidence at trial was that the defendants "operated" the aircraft well before it was attached to the tug and towed away from the gate in preparation for its takeoff. The undisputed evidence was that the defendants, acting as pilot and copilot of this commercial aircraft with over 100 passengers onboard, while sitting in the cockpit of the aircraft and thus in actual physical control of the aircraft, performed extensive preflight duties for the purpose of flying the aircraft.
To "[o]perate, with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose . . . of air navigation including the piloting of aircraft, with or without the right of legal control. . . ." 14 C.F.R. § 1.1 (1997). Captain Chronic, an expert in the field of aircraft operations and flight standardization safety, testified that part of operating the aircraft is properly checking the operational systems; imputing the flight plan, takeoff speeds, fuel load, and any special radio configuration for navigation into the computer system; performing the "flow" and systems checks; obtaining permission to fly by radioing the air traffic controller on an assigned frequency and obtaining clearance information, *197 the altitude, and the transponder code; and obtaining the total weight of the aircraft just before departure which is then used to correlate a speed from a speed chart which becomes critical information in the event a takeoff must be aborted. He testified that each of the many required and vital tasks the pilot and copilot must perform before the aircraft can move, is operating the aircraft, and that it is only after all of these functions are concluded that clearance may be obtained to move the aircraft. Once clearance has been obtained, the captain (pilot) releases the brake and orders the tug to push back the aircraft. Captain Chronic testified that, although the ramp crew is steering the aircraft while it is being towed, the captain (pilot) is actually in charge of the aircraft and is in charge from the time the door is closed. His undisputed testimony was that, by engaging in the extensive preflight procedures, the defendants were "using the aircraft for the purpose of air navigation" and, therefore, operating the aircraft.
The State's case, simply put, was that the defendants operated the aircraft under the influence of alcohol or in a careless or reckless manner during these preflight procedures, not that they flew or drove the aircraft while under the influence or in a careless or reckless manner. If the jury was not persuaded by the evidence that these procedures satisfied the "operate" prong, the defendants would have been not guilty.
In summary, since (1) the State was required to prove beyond a reasonable doubt that Hughes did operate the aircraft (an essential element of the crime charged); (2) the State's case was premised on whether the pilot and copilot violated the statute by taking control of the aircraft and performing the preflight functions while under the influence of alcohol; and (3) as there was no evidence of any mechanical or other problem which rendered the aircraft incapable of being operated without substantial mechanical repairs, the trial court did not abuse its discretion by failing to instruct on inoperability.

THE VERDICT
Pursuant to section 860.13, it is unlawful to operate an aircraft (1) while under the influence or (2) in a careless or reckless manner so as to endanger the life or property of another. Hughes claims that the statute, as written, defines two separate unlawful acts. He, therefore, argues that the trial court erred in permitting the State to argue, over his objection, that it was not necessary for the jurors to reach a unanimous verdict as to which unlawful act the defendant had committed, and in denying his request for a unanimity instruction. We agree.
In reaching the conclusion that section 860.13 creates two separate offenses, rather than a single offense which can be committed in two separate ways, we examined other cases where this issue was addressed. In State v. Rolle, 560 So.2d 1154 (Fla.1990), the Florida Supreme Court, in conducting its examination of Florida's Driving Under the Influence statute, section 316.193, concluded that while the pre-1983 version of the statute created two separate offenses, the statute as amended in 1983, created one offense which could be proven in either of two ways. The earlier version made it a crime if you either (1) drove or were in actual physical control of a vehicle while under the influence to the extent that your normal faculties were impaired or (2) drove or were in actual physical control of a vehicle with a blood alcohol level of .10 or above. In contrast, the post-1983 version made it unlawful to drive or be in actual physical control of a *198 vehicle while under the influence (1) to the extent that your normal faculties were impaired or (2) with a blood alcohol level of .10 or above. This later version created a single offense because under either scenario, the driver was guilty if he drove or was in actual physical control of a vehicle while under the influence to a particular degree: in one instance, to the extent that his normal faculties were impaired, and in the other instance if his blood alcohol level reached a particular numerical level. Thus, under the post-1983 version of the statute, which created one offense which could be proven by alternative theories, the jury would not be required to unanimously agree on which theory was proven. Euceda v. State, 711 So.2d 122 (Fla. 3d DCA 1998); Dejerez v. State, 580 So.2d 656 (Fla. 4th DCA 1991).
The reverse was found in State v. Dumas, 700 So.2d 1223 (Fla.1997), regarding section 316.027, which prohibits leaving the scene of an accident involving death or personal injury. The Florida Supreme Court found that the earlier version of the statute created one offense, while the 1983 statute, as amended, created two separate offenses. The earlier version provided that leaving the scene of an accident resulting in injury or death was a third degree felony. The post-1983 version, however, separated the offense into two categories based upon the level of the injury and provides for greater punishment based upon the severity of the offense. The post-1983 version provides that leaving the scene of an accident resulting in injury is a third degree felony, while leaving the scene of an accident resulting in death is a second degree felony. As each offense varies in degree and in punishment, unanimity is required.
Based upon our review of these cases, we conclude that when a statute sets forth a specific prohibited act and then specifies the various means by which the act can be committed, then, and only then, does it create a single offense. When a statute sets forth various acts, stating that each is prohibited and/or provides for different punishment depending on the act committed, then the statute creates multiple offenses.
The State argues that section 860.13 creates a single offense, the dangerous operation of an aircraft, which can be violated in either of two ways, by operating an aircraft while under the influence or by operating an aircraft in a careless or reckless manner. We disagree, as the statute is simply not worded as the State suggests. The title of the statute is "Operation of aircraft while intoxicated or in careless or reckless manner," while the statute itself specifies that "(1) It shall be unlawful for any person: (a) To operate an aircraft . . . while under the influence . . . or (b) To operate an aircraft . . . in a careless or reckless manner so as to endanger the life or property of another." Thus, we conclude that the statute prohibits two separate acts: one prohibiting the operation of an aircraft while under the influence and, the other, prohibiting the operation of an aircraft in a careless or reckless manner. Because the statute, as worded, creates two separate offenses,[2] we agree with Hughes that unanimity was required. Thus, the trial court erred in permitting the State to argue otherwise and by denying Hughes' request for a curative instruction.
Based on the particular facts of this case and the wording of section 860.13, we, however, conclude that the error constitutes harmless error, as any reasonable *199 person who concluded that Hughes was operating the aircraft while under the influence, would conclude that his conduct was careless or reckless. Thus, the jury by unanimously finding that Hughes was guilty of operating an aircraft either under the influence, or in a careless or reckless manner, necessarily found that he had operated the aircraft in a careless or reckless manner.

MISCELLANEOUS
We have additionally reviewed the remaining arguments on appeal, and conclude that they are without merit.
Affirmed.
SUAREZ, J., concurs.
SCHWARTZ, Senior Judge, concurs in conclusion only.
NOTES
[1] We likewise find that Sergeant Leibowitz's brief reference to Florida's .08 percent blood alcohol limit for operating a motor vehicle was error, but the error was harmless beyond a reasonable doubt based upon the totality of the evidence and the State's failure to refer to it during its closing argument.
[2] If the legislature intended to establish a single offense that can be committed in two separate ways, it must amend the statute accordingly.