ROTHENBERG, J.
(dissenting).
Cliff Berry, Inc. (“CBI”), and Jeffrey Clint Smith (“Smith”) (collectively, “the defendants”) were convicted of two counts of first degree grand theft and two counts of organized scheme to defraud[24] for their organized scheme to steal jet fuel and money from the Miami-Dade Aviation Department (“the Aviation Department”). This scheme, which spanned over a three-year period, involved: (1) the theft of hundreds of thousands of gallons of jet fuel, which the defendants sold for profit; and (2) the defendants’ submission of fraudulent invoices to the Aviation Department, resulting in the defendants fraudulently receiving hundreds of thousands of dollars.
The majority reverses these convictions, which were obtained by overwhelming evidence, on the basis that the trial court abused its discretion in: (1) refusing to give the defendants’ requested “good faith” special jury instruction; and (2) failing to conduct a Richardson[25] hearing. A careful review of the record, however, reveals that the trial court did not abuse its discretion, and, in fact, would have erred in giving the requested special jury instruction because the instruction was false and misleading, and the defendants failed to present any evidence to support their theory of defense. The trial court also did not abuse its discretion in failing to conduct a Richardson hearing because the defendants did not object, allege a discovery violation, or request such a hearing. Rather, the record reflects that the defendants merely inquired whether all Brady[26] information had been disclosed. When the issue of a possible discovery violation was first raised in post-trial pleadings, the trial court did conduct a Richardson hearing; found no discovery violation had occurred; concluded that the defendants waived the issue by failing to timely raise it; and found that even if a discovery violation occurred, the defendants were not procedurally prejudiced.
Because the evidence is critical to understanding the nature of the charges and the correctness of the trial court’s rulings, this dissent will provide a more complete recitation of the evidence, which, along with an analysis of the law, will demonstrate that to reverse the defendants’ convictions on the grounds relied on by the majority would be error and a miscarriage of justice.

*421
THE EVIDENCE

This case involves the theft of jet fuel stolen by the defendants from the Aviation Department’s fuel facility at Miami International Airport (“the fuel farm”), and fraudulent invoices submitted by the defendants and paid by the Aviation Department to the defendants. The fuel farm’s operation is similar to that of a bank. Jet fuel, purchased by the various airlines, is pumped directly from tankers at Port Everglades through underground pipes to the fuel farm, and like bank deposits, the jet fuel is comingled and “deposited” into huge fuel tanks at the fuel farm to be “withdrawn” as needed by the individual airlines. Each of these jet fuel tanks holds approximately four million gallons of jet fuel. Because the tankers are dirty, the jet fuel is run through a filtration system at the fuel farm. The jet fuel flowing between Port Everglades and the fuel farm is transported by “inbound lines,” filtered, deposited into holding tanks, and transferred via “outbound lines” to the individual airlines at the airport. The airlines pay a fee to the Aviation Department for this service.
In addition to receipt, filtration, storage, and transportation of the jet fuel to the airlines, the fuel farm must safely dispose of water contaminated by fuel and other contaminants. This contaminated water is collected from a number of different sources: oil spills unconnected to the fuel farm or airport; leaked fuel comingled with rainwater and other run-off water collected in pits on the ground; rainwater and condensation that accumulates in the fuel tanks; and water used in various clean-up operations. Thus, in addition to the jet fuel tanks, the fuel farm has a “frac tank,” which is where contaminated fuel (fuel removed from the bottom of the jet fuel tanks and fuel lines during the cleaning process) is stored; and “tank 21,” which is where the contaminated water is stored.
Because jet fuel is lighter than water, any water that accumulates in the fuel tanks sinks to the bottom. Once or twice a year, the jet fuel tanks are cleaned to remove any water and contaminates. This is accomplished by allowing the jet fuel to be used until it reaches a certain level. Then the jet fuel remaining at the bottom of the tank is pumped into tanker trucks and deposited into other jet fuel tanks to settle out. The remaining fuel/water mixture left at the very bottom of the tank is generally transferred to a frac tank. When the jet fuel lines are pressure cleaned (“sumped”) once a month, the fuel/water/dirt by-product is also deposited into the frac tank if it is mostly jet fuel. However, when the vacuum truck collects mostly water while sumping a fuel line or sumping or vacuuming water collected in run-off pits, this material (petroleum contaminated water) is deposited in tank 21.
The Aviation Department entered into a contract with Aircraft Services International Group (“ASIG”) to operate and manage the fuel farm. ASIG contracted with RCR Oil, a fuel company, to remove the contaminated fuel from the frac tank. In May of 2000, ASIG contracted with CBI to remove petroleum contaminated water from the holding tank (tank 21), for which the Aviation Department agreed to pay CBI 13<t a gallon (“the first contract”). In October of 2001, ASIG and CBI entered into a second contract (“the second contract”) to allow CBI to remove contaminated jet fuel and non-contaminated jet fuel. Whereas the Aviation Department paid CBI 13d: a gallon to remove the petroleum contaminated water, CBI agreed to pay the Aviation Department for any contaminated jet fuel and non-contaminated jet fuel it removed at lOct and 25<t a gallon, respectively. Contaminated jet fuel is jet *422 fuel that was used in a flushing operation or collected from the bottom of a fuel tank that is unfit for airline consumption. Non-contaminated jet fuel is virgin jet fuel that is rejected for airline use for whatever reason.
During the time relevant to this prosecution (2000-2003), Rick Caride served as the fuel farm’s facility manager, supervising the “operations” side of the facility, including maintaining the paperwork and performing the daily fuel calculations. Brian Schneir, who was directly supervised by Caride, served as the maintenance supervisor of the facility.
Caride and Schneir were involved in a number of schemes at the fuel farm including: the theft of jet fuel; submitting inflated invoices for parts; submitting fraudulent invoices for the removal of petroleum contaminated water; and receiving kickbacks for these endeavors. Caride and Schneir conspired with individuals at RCR Oil and Tropical Oil to steal jet fuel. RCR Oil and Tropical Oil had contracts with ASIG to pick up the waste fuel being held in the frac tank. Caride and Schneir directed that truck loads of jet fuel be dumped into the frac tank rather than into the jet fuel tanks, and they received a kickback for each gallon of jet-fuel-enriched, contaminated fuel RCR Oil and Tropical Oil removed from the frac tank. Caride and Schneir also conspired with American Petroleum Services to submit inflated invoices for parts. Lastly, Caride and Schneir conspired with CBI and Jeffrey Clint Smith, the appellants, to: steal jet fuel directly from the inbound jet fuel lines running from Port Everglades to the fuel farm; steal jet fuel directly from the outbound jet fuel lines running from the fuel farm to the airlines; steal jet fuel from tank 21 by allowing CBI to remove the jet fuel from the top of the tank that had separated from the water and to invoice it as petroleum contaminated water, which sits at the bottom of the tank; and submit fraudulent invoices for the removal of petroleum contaminated water. Because this appeal addresses the conspiracies and thefts involving CBI and Smith, only the evidence relevant to these defendants will be discussed.
Brian Schneir, who pled guilty to his involvement in the aforementioned crimes at the fuel farm, testified that Smith, CBI’s employee, approached him in 1999, and inquired about obtaining jet fuel from the fuel farm. By early 2000, Schneir began supplying Smith and CBI with stolen jet fuel. Schneir explained that Smith and CBI defrauded and stole from the Aviation Department by: stealing the jet fuel; submitting bogus invoices for the removal of petroleum contaminated water; and submitting invoices for the removal of petroleum contaminated water when they were in fact removing jet fuel and jet fuel enriched water from the fuel farm.
The pure jet fuel was stolen as follows. Schneir testified that Smith would send his driver Mitch Oceguera to the fuel farm with CBI’s tankers; Schneir would allow Mitch Oceguera to enter through the gate; and Schneir would hook up CBI’s tanker to the inbound and outbound lines and allow Mitch Oceguera to fill CBI’s tanker, which holds 6000 to 7000 gallons, with pure Jet A Fuel. At least ten to twelve tankers of pure Jet A Fuel were removed from the outbound lines in this manner and as many additional loads were removed from the inbound lines. Smith and CBI paid Schneir and Caride 30cc per gallon for the pure Jet A Fuel. Smith would meet Schneir at a Citgo station and pay him in cash. Schneir would then divide the money with Caride.
Schneir also explained how jet fuel was stolen directly from the jet fuel tanks. As explained earlier, when the jet fuel tanks *423 were cleaned, the jet fuel was used until it reached a certain level, usually approximately 50,000 gallons. Employees of the fuel farm would then suck out the remainder of the jet fuel, deposit it into other jet fuel tanks, and then clean the tank. However, on several occasions, after Schneir called Smith, Smith would send his driver, Mitch Oceguera, to the fuel farm with CBI’s tanker. Mitch Oceguera would fill the CBI tanker with jet fuel, and then take the tanker to CBI where the jet fuel was deposited into a special tank located at CBI (tank 7). This jet fuel was later sold for cash, off the books, to companies located along the Miami River. Smith paid Schneir and Caride 30$ a gallon for this fuel and, of course, ASIG and the County were not paid for the jet fuel, the payments were made in cash, and no manifests were generated. Schneir testified that Smith and CBI stole jet fuel from the jet fuel tanks five or six times, and on each occasion, the amount of jet fuel stolen was between 12,000 and 50,000 gallons, depending on the amount of jet fuel remaining in the fuel tank after the jet fuel was drawn down for cleaning.
The third scheme Schneir, Caride, Smith, and CBI used to steal jet fuel involved tank 21, which stored the petroleum contaminated water. As previously discussed, the contaminated fuel was supposed to go into the frac tank. However, sometimes this fuel-rich mixture would be deposited into tank 21. The jet fuel, water, and contaminants that were deposited into tank 21 would separate out, with the contaminants and water sinking to the bottom and the jet fuel rising to the top.
Schneir explained that tank 21 had two separate lines for removal of its contents. One line, with a diameter of six inches, ran from the front to the right side of the tank. This line was for the removal of the petroleum contaminated water that settled to the bottom of the tank. The second line, which only measured two inches in diameter and was located on the back side of the tank, was used to remove the jet fuel at the top of the tank. Schneir testified that when the jet fuel was high enough in the tank, Mitch Oceguera would hook up to the second line in the back of the tank and remove the jet fuel. Rather than invoicing the fuel as contaminated or non-contaminated jet fuel, Smith and CBI invoiced the fuel as petroleum contaminated water. Thus, rather than CBI paying the Aviation Department 25$ a gallon for jet fuel that rose to the top of tank 21, the Aviation Department paid CBI 18$ a gallon for the removal of what it believed was petroleum contaminated water. However, when the jet fuel was too low to be pumped out through the higher line, Mitch Oceguera would remove the petroleum contaminated water through the bottom line to get to the jet fuel sitting on top of the water. Schneir testified that CBI and Smith removed the jet fuel through the tank’s second line on approximately ten to twelve occasions, paying Schneir and Caride a kickback for each gallon of jet fuel they obtained by this method.
The problems associated with the theft of the jet fuel at the top of tank 21 were many, and it was not as lucrative a scheme as stealing the jet fuel directly from the inbound and outbound jet fuel lines or from the fuel tanks where the pure jet fuel was stored. One problem was an inventory problem. The fuel farm kept track of the petroleum contaminated water and jet fuel at the fuel farm, which varied due to rain, heat, cold, evaporation, and the number of cleaning operations. By manifesting the jet fuel CBI and Smith were stealing from tank 21 as petroleum contaminated water, they were driving the numbers for petroleum contaminated water to an inflated number which could not be explained as the product of normal operations. Like *424 wise, the reduction of available jet fuel beyond normal evaporation expectations (.25%) attracted notice and an investigation.
Schneir explained that he checked the fuel calculations every day to determine how much fuel could be stolen without anyone noticing. For example, if sixty million gallons of fuel were pumped into the fuel farm for the month, he figured he and his confederates in the scheme could steal 150,000 gallons and stay within the .25% acceptable variation/loss range.
In 2002, Schneir, Caride, Smith, and CBI added an additional scheme. Smith and CBI began submitting bogus manifests along with the manifests for actual truckloads of petroleum contaminated water they removed from the fuel farm. Each manifest was for 7500 gallons of petroleum contaminated water. Smith and CBI were paid 13<t a gallon for the petroleum contaminated water they invoiced (real and bogus), and in return they paid Schneir and Caride 3c a gallon as a kickback. Schneir testified that they received between $10,000 and $12,000 a month from Smith and CBI for this scheme.
Schneir testified that Smith and CBI paid him approximately $480,000 in cash which he split evenly with Caride for their role in these schemes. Schneir’s testimony was corroborated by several witnesses. Richard Crisafulli, who worked as a maintenance mechanic for ASIG from May 1999 until October 2000, but was not involved in any of these schemes, testified he saw CBI’s tanker truck in areas of the fuel farm where it did not belong. For example, he saw CBI’s tanker in dyke area three, which houses two fuel tanks, a frac tank, an inbound filtration system, and a pipeline with a valve that is used to turn the flow of fuel through the inbound line on and off. On one occasion, Crisafulli saw CBI’s driver pull up to the maintenance building and honk the truck’s horn, and when Schneir exited the building, he instructed Crisafulli to open the gate to dyke area seven. Crisafulli testified that he opened the gate and then observed Mitch Oceguera back a CBI tanker up to fuel tank 26, and throw a hose into the tank. When Crisafulli returned to the maintenance building, Schneir asked him to stay with Mitch Oceguera while he “was getting his truck fueled up.” However, because Crisafulli did not want to be a part of what was going on, he made an excuse and left the area. The following day when he confronted Caride, Caride chided Crisafulli for not being “a team player” and told him he had to play by his rules — that it was “his way or the highway.”
Crisafulli testified that there was no legitimate reason for CBI’s truck to be in that area. All of the sumping was done by ASIG using its own trucks and no one except ASIG was allowed to hook up to a pipeline, which contained pure jet fuel. Crisafulli testified that he “constantly saw” CBI’s truck hooked up to the inbound fuel line valve. He explained that although he only worked at the fuel farm twice a week, he would see CBI’s truck hooked up to the fuel line twice a day on the days he worked. On one occasion, he also saw Caride enter a CBI truck occupied by Smith, and when Caride exited the truck approximately fifteen minutes later, he was carrying a brown paper bag. Caride then opened the bag, which was full of money, and told Crisafulli, “This just bought my new Mustang.” Crisafulli left ASIG approximately one month following this observation.
Mitch Oceguera, CBI’s driver, confirmed that Smith would send him to the fuel farm to pick up petroleum contaminated water and jet fuel. He explained that sometimes he would fill his truck with jet fuel directly from the fuel lines; pump out the *425 jet fuel from tank 21; or pick up the petroleum contaminated water from tank 21. When he picked up jet fuel, Smith instructed him to offload it into tank 7 at CBI, and when his load was mostly water, it was dumped into other tanks at CBI. Mitch Oceguera would generally make nine or ten runs to the fuel farm a day, carrying 7500 gallons on each trip. All of the manifests were blank. Smith would fill them out and Mitch Oceguera would sign them without reading or verifying them, and, therefore, he did not know whether the manifests he signed were accurate or whether they represented actual loads. Mitch Oceguera also verified that he picked up petroleum-contaminated water, contaminated fuel, and pure jet fuel from the fuel farm.
Donna Hourigan, the comptroller for CBI, testified that CBI never documented jet fuel as an asset of the company and she never saw an invoice or money being paid for the receipt or sale of jet fuel, nor was she aware that CBI had any jet fuel at its facility. In fact, the first time she heard about jet fuel at CBI was in 2002 at a meeting in CBI’s office with Cliff Berry (“Berry”) and Smith, when Berry began complaining about missing jet fuel from a tank at CBI. When she asked Berry what fuel he was talking about because they did not have jet fuel at CBI, he changed the subject. Subsequent to that conversation, Hourigan confronted Smith regarding a stack of manifests that came into the office documenting loads of jet fuel CBI had removed from the fuel farm because CBI was not set up to bill for jet fuel. After this conversation, Smith changed the manifests to read that they were for the removal of petroleum contaminated water.
Smith’s claim that CBI was only hauling petroleum contaminated water was directly refuted by CBI’s own driver, who admitted to removing jet fuel from the fuel farm taken directly from the inbound fuel lines, fuel tanks, and tank 21, and the testimony of his co-conspirator, Brian Schneir. Additionally, Luis Costa, the owner of Costa Oil, confirmed that he purchased jet fuel from CBI, which he in turn sold to freighters on the Miami River. Costa explained that he purchased jet fuel from CBI on ten to fifteen occasions, these purchases were all “off the books” in cash, and he, in turn, sold'the fuel for cash.
Patricia Nichols, who worked for the Aviation Department from 1993 to 2004, explained how Schneir, Caride, Smith, and CBI were able to carry out their criminal enterprise and how they got caught. She explained that inventory control at the fuel farm, which received millions of gallons of fuel a day, was problematic for a number of reasons. First, when the fuel is warm, it expands, and when it cools, it shrinks. Moreover, fuel evaporates; water settles out and accumulates at the bottom of the fuel tanks; fuel leaks at valves; fuel spills; and fuel is lost when the lines and tanks are cleaned. In 2000, however, the airlines began calling Miami-Dade County to complain that they were running low on jet fuel. An investigation by the Aviation Department revealed that it was losing an unexplained amount of jet fuel and paying for the removal of an unusually large number of gallons of petroleum contaminated water. When Ms. Nichols checked the numbers against rainfall, spills, and cleaning operations, the numbers did not add up. Eventually the investigation led to Schneir, who admitted to his involvement and became a cooperating witness.

THE MAJORITY’S GROUNDS FOR REVERSAL

The majority concludes that the trial court reversibly erred by failing to provide to the jury the defendants’ requested jury instruction regarding their good faith theo *426 ry of defense.[27] The defendants argued that they did not intend to steal jet fuel from tank 21. Rather, they mistakenly believed they were permitted to remove all of the contents of tank 21, and regardless of the jet fuel content, were permitted to invoice the material as petroleum contaminated water. Additionally, the defendants asked that the jury be instructed that a dispute over the interpretation of a contract does not give rise to criminal liability,[28] and that the jury be provided with the Florida Administrative Code’s definition of “petroleum/contact/water.”

OUR STANDARD OF REVIEW

The majority correctly notes that standard jury instructions are presumed correct and are preferred over special instructions, Stephens v. State, 787 So.2d 747, 755 (Fla.2001), and “[t]he trial court is not required to provide additional instructions if the instructions given are adequate or when a requested instruction would only serve to confuse the jury.” Hughes v. State, 943 So.2d 176, 194 (Fla. 3d DCA 2006). The majority further recognizes that “[t]he decision on whether to give a particular jury instruction is within the trial court’s discretion,” Card v. State, 803 So.2d 613, 624 (Fla.2001), and that our standard of review mandates that, absent demonstration of prejudicial error, such decisions should not be disturbed on appeal. Id.
Based on a careful review of the record, it is clear that the trial court did not abuse its discretion by failing to give a special “good faith” jury instruction because: (1) the requested instruction was false and misleading and would only have served to confuse the jury; (2) the jury instructions given were adequate; and (3) there was no evidence presented to support the defendants’ “good faith” theory of defense. Additionally, there is no prejudice, because: the trial court permitted the defendants to introduce the Florida Administrative Code as a defense exhibit and to argue its relevance to the jury; permitted the defendants to argue their good faith theory of defense despite no evidence in support of that theory; and the defendants’ good faith theory of defense was directed to only a very small portion of the State’s case, which even if proven would not have affected the verdicts, and reversal of the jury’s verdict is not warranted.

*427
THE DEFENDANTS’ GOOD FAITH THEORY OF DEFENSE

During closing arguments, the defendants’ lawyers argued that the defendants were operating under the mistaken belief that all of the contents in tank 21 qualified as petroleum contaminated water. Thus, when the defendants invoiced all of the contents removed from tank 21 as petroleum contaminated water, it was based on this misconception, not an intent to steal. Based on this argument, the defendants requested the jury be instructed that “ ‘[g]ood faith’ is a complete defense to the charges in the Information ... [and] [t]he State must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the information.” (See footnote 2 of this dissent for the full instruction). The trial court correctly refused to give this instruction because: (1) the first part of the instruction quoted is misleading and false; (2) the second part of the instruction quoted was adequately covered in the standard instructions given; and (3) there was no evidence presented to warrant a “good faith” instruction. See Stephens, 787 So.2d at 756 (holding that to be entitled to a special jury instruction, the defendant must prove: (1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the defendant’s theory of defense; and (3) the special instruction was a correct statement of the law and would not mislead or confuse the jury); Parker v. State, 641 So.2d 369, 376 (Fla.1994) (same).

The proposed instruction was misleading and false

Although the defendants’ proposed good faith instruction was an accurate statement of the law, it was false and misleading based on the charges in this case, and had it been given, it would have been error. See Carpenter v. State, 785 So.2d 1182, 1200 (Fla.2001) (holding that “it is preferable that a standard jury instruction be given if it adequately explains the law, and giving a non-standard instruction that misleads the jury is reversible error”) (citations omitted). But, of course, had the instruction been given and had the jury found the defendants not guilty, the State would have had no appellate remedy. Sanabria v. United States, 437 U.S. 54, 64, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (noting that double jeopardy protections prohibit retrying a defendant after a jury has acquitted him of the charges).
The defendants’ proposed instruction provides that “ ‘[g]ood faith’ is a complete defense to the charges in the Information.” This instruction is misleading and false based on the charges in this case and the evidence presented. The defendants were charged and convicted for their involvement in the organized scheme to defraud the Aviation Department and the theft of jet fuel in Counts 16 and 17 of the information. In support of Counts 16 and 17, the State presented evidence that the defendants stole jet fuel from the Aviation Department in several different ways: (1) directly from the inbound fuel lines running from Port Everglades to the fuel farm; (2) directly from the outbound lines that transported the jet fuel from the jet fuel tanks at the fuel farm to the individual airlines at the airport; (3) from the jet fuel tanks that had been drawn down for cleaning operations; and (4) from the top of tank 21 after the water had separated out and settled to the bottom of the tank. The defendants were also charged and convicted for their involvement in the organized scheme to defraud and for the theft of money in Counts 14 and 15. In support of Counts 14 and 15, the State presented evidence that the defendants knowingly, intentionally, and fraudulently invoiced jet fuel they removed from tank 21 as petro *428 leum contaminated water, and additionally, they submitted completely fictitious invoices.
The defendants’ proposed “good faith” jury instruction only related to the improper invoicing of jet fuel from tank 21 as petroleum contaminated water, which according to the trial testimony, was a small percentage of the thefts committed by the defendants. Brian Schneir testified that in terms of the overall theft of jet fuel, tank 21 was not the “primary source,” as the majority incorrectly states, because it was much easier to steal jet fuel directly from the inbound and outbound lines and from the fuel tanks. Therefore, the defendants only stole jet fuel from tank 21 as “kind of a last resort.” Thus, the statement in the defendants’ proposed good faith instruction was false because good faith was not a “complete defense to the charges in the Information.” Good faith was not a defense to the 300,000 to 540,000 gallons of jet fuel stolen from the inbound and outbound lines and it was not a defense to the theft of the 250,000 to 300,000 gallons of jet fuel taken from the jet fuel tanks. Good faith also was not a defense to the money the defendants received by submitting completely fictitious invoices for petroleum contaminated water. At best, good faith was only a defense to the theft of money and fuel by removing jet fuel from tank 21, and then invoicing it as petroleum contaminated water, which accounted for only a small portion of the money and jet fuel stolen by the defendants. A good faith mistake as to the invoicing of jet fuel and contaminated jet fuel as petroleum contaminated water taken from tank 21 would not have exonerated the defendants as to any of the counts charged because each count also included the pure jet fuel stolen from the inbound and outbound lines and the tanks that stored the pure jet fuel. Based on the evidence and the charges, the defendants’ proposed jury instruction was a misstatement because the good faith defense was not a “complete defense to the charges in the information”; and therefore, the special instruction would have misled and confused the jury. Thus, the trial court correctly refused to give this false and misleading instruction to the jury. See Stephens, 787 So.2d at 756-57 (concluding that the trial court did not err in denying the defendant’s requested special instruction because, although the defendant demonstrated that the instruction would have supported his theory of defense, he failed to establish that the standard instruction did not adequately cover his theory of defense, and that the special instruction would not have misled or confused the jury).

The second part of the proposed instruction was adequately covered in the instructions given

In addition to the misleading and false aspect of the defendants’ proposed jury instruction, the standard jury instructions adequately instructed the jury regarding the elements of the crimes and the State’s burden of proof. The defendants requested that the jury be instructed that “[t]he State must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charge in the information.” The grand theft instruction provided to the jury in relevant part is as follows:
[T]o prove the crime of Grand Theft as charged in Counts 15 and 17 the state must prove both of the following two elements beyond a reasonable doubt:
1. “The defendant” knowingly and unlawfully obtained, used, or endeavored to obtain or use the funds of the MIAMI-DADE AVIATION DEPARTMENT as charged in Count 15 and *429 JET-A Aviation Fuel as charged in Count 17[;] and
2. He did so with intent to, either temporarily or permanently, deprive the MIAMI-DADE AVIATION DEPARTMENT ... of funds, as charged in Count 15, and JET-A Fuel charged in Count 17.
(Emphasis added). The organized scheme to defraud jury instruction provided to the jury in relevant part is as follows:
[T]o prove the crime of Organized Scheme to Defraud, in Counts 14 and 16, the State must prove both of the following two elements beyond a reasonable doubt: 1. “The defendant” willfully engaged in a scheme to defraud as defined below; and 2. “The defendant” obtained property, to wit: Funds of the MIAMI-DADE AVIATION DEPARTMENT, as charged in Count 14, and JET-A Aviation Fuel, as charged in Count 16.
[[Image here]]
“Scheme to Defraud” means a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, or promises or willful misrepresentations of a future act.
[[Image here]]
“Willfully” means that the act was committed intentionally, knowingly and purposely. It means that the act was committed voluntarily and purposely, with the specific intent to do something that the law forbids, and that the act was committed with bad purpose, either to disobey or disregard the law.
“Knowingly” means with actual knowledge and understanding of the facts or the truth. “Knowingly” means an act done voluntarily and intentionally and not because of mistake or accident.
(Emphasis added).
As is readily obvious, the standard instructions the trial court provided to the jury did instruct the jury that before it could find the defendants guilty, the State was required to prove beyond a reasonable doubt that the defendants acted with the specific intent to defraud. In fact, the instructions given went further than the defendants’ requested instruction by carefully explaining the “willful” and “knowledge” elements of the State’s burden. Thus, the trial court did not abuse its discretion in refusing to give the defendants’ special instruction. See Stephens, 787 So.2d at 756; Carpenter, 785 So.2d at 1199-1200; Parker v. State, 641 So.2d 369, 376 (Fla.1994).

There was no evidence presented to warrant a “good faith” instruction

The defendants were legally entitled to have the jury instructed on the law applicable to their theory of defense if the theory was legally valid and there was any evidence in the record to support it. Although “good faith” is a valid defense, the defendants presented no evidence to support such a defense, and as already addressed, the proposed instruction was false and misleading, and was adequately addressed in the standard instructions given.
The record in this case, while lengthy, is completely devoid of any evidence to support such a defense. The defendants’ trial counsel argued in closing arguments that the defendants did not intend to steal jet fuel from tank 21 — that they mistakenly believed they were permitted to remove all of the contents of tank 21, regardless of whether the substance they removed was jet fuel from the top of the tank or petroleum contaminated water at the bottom of the tank, and then invoice all of it as *430 petroleum contaminated water. Counsel’s argument is not evidence, however, and the defendants were required to present some evidence regarding them intent or mistaken belief. They did not.
Notably, Smith did not testify and he did not provide a pretrial statement to the police. Thus, there is no direct evidence of Smith’s interpretation of the contracts, “good intent,” “mistaken belief,” or “confusion.” There are, of course, volumes of testimony of his criminal intent — including the testimony of one of his partners in crime, Schneir; the hundreds of thousands of dollars in kickbacks he paid Schneir and Caride; the phony manifests; and his black market sales of the stolen fuel.
The majority finds “evidence” of the defendants’ “good faith belief’ from two sources: CBI’s driver’s testimony and the contracts entered into by CBI and ASIG. However, neither source provides any insight, let alone evidence, as to CBI’s or Smith’s intent.

CBI’s Driver

The majority opinion relies on the following: CBI’s driver testified that he believed everything he picked up from Tank 21 was PCW [petroleum contaminated water]. CBI’s driver, Mitch Oceguera, however, never testified that he had ever seen the contracts entered into by CBI, nor did he testify that he believed the contracts entitled him to remove all of the contents from tank 21 and invoice it as petroleum contaminated water. But more importantly, his belief is totally irrelevant. He was not charged with any wrongdoing and, in fact, his testimony revealed that he was just an employee who did what he was told to do, without question.
Mitch Oceguera testified that Smith was his boss at CBI. Smith sometimes told him to go to the fuel farm to pick up petroleum contaminated water; sometimes to pick up contaminated fuel; and sometimes to pick up jet fuel, and to transport what he picked up to CBI, which he identified as a “water plant.” He also admitted that even when he picked up jet fuel, CBI would manifest it as petroleum contaminated water. Mitch Oceguera confirmed that sometimes he took jet fuel directly from the jet fuel lines and tank 21, but he was just doing what he was told to do, and did not know he was doing something illegal. He explained that he knew the difference between jet fuel and petroleum contaminated water, and that he and Smith treated them differently. When he transported jet fuel taken from the fuel lines or from the top of tank 21, he was instructed to deposit it into a special fuel tank, tank 7, at CBI, whereas the petroleum contaminated water was deposited in the other tanks at the “water plant.” Mitch Ocegu-era also testified that at the end of the month, Smith would fill out as many as ten additional manifests for ten additional loads of petroleum contaminated water and hand them to him to sign. He admitted that he did not attempt to verify the information contained in these additional manifests. He trusted Smith, did what he was told to do, signed the extra manifests, and turned them in for payment.
Mitch Oceguera’s testimony is evidence of his good faith, but it sheds no light and provides no evidence of CBI’s or Smith’s good faith. To the contrary, his testimony supports the State’s case — that the defendants were stealing jet fuel from the inbound and outbound lines; stealing jet fuel and money by removing jet fuel from tank 21 and manifesting it as petroleum contaminated water; and stealing additional money by creating totally fictitious manifests reflecting loads that never occurred.

The Contracts

The majority also relies on the contracts entered into by CBI and ASIG as evidence *431 of the defendants’ good faith or confusion. Although the defendants did not testify that the contracts they drafted were confusing or that the terms were unclear, the majority concludes that because the contracts do not define “petroleum contaminated water,” the defendants may have been unclear or confused as to when petroleum contaminated water became contaminated fuel.
Respectfully, this conclusion suffers from many infirmities. First, the defendants presented no evidence that they were confused. Second, the contracts entered into by CBI and the Aviation Department differentiate between pure jet fuel, contaminated jet fuel, and petroleum contaminated water, and although the contracts do not define petroleum contaminated water, they do define contaminated and non-contaminated jet fuel. Third, the majority ignores the unrefuted evidence that most of the jet fuel stolen by the defendants was pure Jet A Fuel stolen from the inbound and outbound fuel lines and the Jet A Fuel tanks, not tank 21. Because the pure jet fuel was defined by contract, the contracts do not provide any evidence of “good faith” as to the theft of this fuel. Fourth, the terms contained in the contracts are commonly used and understood in the industry. Fifth, the contracts were drafted by the defendants, and the contracts draw a distinction between water contaminated with petroleum and contaminated or non-contaminated jet fuel, and the defendants and their driver, Mitch Oceguera, treated the petroleum contaminated water and the jet fuel very differently.
(1) The defendants did not offer any evidence that they were confused
The defendants did not testify and there is no evidence of their interpretation of the contracts or that they were confused as to the meaning of the contracts they drafted. No witness testified as to the defendants’ interpretation of the contracts, or that they found the terms to be confusing.
(2) The contracts specifically define contaminated and non-contaminated jet fuel
The second contract clearly differentiates between the following substances CBI was contracted to remove: PCW (petroleum contaminated water), spent absorbents, petroleum contaminated soil, Jet A Fuel-Contaminated, and Jet A Fuel-Non-contaminated. The second contract also defines contaminated and non-contaminated jet fuel. Jet A Fuel-Contaminated is defined in the contract as “[a]ny fuel that is not virgin, i.e. fuel that has been used in flushing ops, tank bottoms sumped by CBI due to cloudiness, water contaminated and unfit for use by ASIG.” Jet A Fuel-Non-contaminated is defined as “[a]ny fuel that has not been rejected for use by ASIG-virgin fuel.” Pursuant to this contract, CBI was to be paid 13d: a gallon for the petroleum contaminated water it removed. Conversely, CBI was required to pay the Aviation Department 10ct for every gallon of contaminated jet fuel (any fuel that was not virgin and was unfit for use by ASIG), and 25<t for every gallon of non-contaminated jet fuel (virgin jet fuel) it removed from the fuel farm.
Thus, the contracts provided for the removal of water, soil, absorbents, and jet fuel. The Aviation Department was to pay CBI to remove the absorbents and the contaminated water and soil. CBI was to pay the Aviation Department for any jet fuel it removed. And, although the contracts do not define petroleum contaminated water, they do explicitly define jet fuel (Jet A Fuel-Non-contaminated), and contaminated jet fuel (Jet A Fuel-Contaminated).
*432 (3) Jet A Fuel-Non-contaminated, was clearly defined in the contracts and the majority of the jet fuel stolen was Jet A Fuel-Non-contaminated
The majority overlooks that most of the jet fuel stolen by the defendants did not come from tank 21, but rather, from the (1) inbound and outbound jet fuel lines carrying jet fuel from Port Everglades to the fuel farm and from the fuel farm to the airlines at the airport, and (2) jet fuel tanks being drawn down for cleaning operations. To prove first degree grand theft, the State was only required to prove the defendants stole $50,000 worth of jet fuel. The unrefuted evidence was that between 300,000 and 500,000 gallons of pure Jet A Fuel was stolen from the inbound and outbound jet fuel lines alone, far in excess of the $50,000 threshold. The defendants stole an additional 250,000 to 300,000 gallons of Jet A Fuel from the jet fuel tanks at the fuel farm. It is undisputed that they did not pay for any of this fuel.
Thus, the State proved its case beyond a reasonable doubt without even considering the jet fuel stolen from tank 21. And, as already discussed, the defendants’ good faith defense did not and could not relate to the Jet A Fuel stolen from the jet fuel lines and jet fuel tanks, which were not invoiced at all.
(4) The terms in the contracts were either defined or commonly used and understood in the industry and by the defendants
The contracts defined Jet A Fuel-Non-contaminated as virgin jet fuel (to be used by the airlines) and Jet A Fuel-Contaminated as jet fuel that was unfit for use by ASIG (jet fuel unfit for use in airplanes). Patricia Nichols testified that although petroleum contaminated water was not specifically defined, the people who work at fuel facilities know what petroleum contaminated water is, there is clearly a difference between petroleum contaminated water and jet fuel, and “even her mother could distinguish the two.”
Smith and Mitch Oceguera, CBI’s driver, certainly knew the difference. Mitch Oceguera testified that sometimes Smith sent him to the fuel farm to pick up petroleum contaminated water and sometimes to pick up jet fuel. So obviously Smith knew the difference between the two. Mitch Oceguera clearly understood the difference between the two because he testified that tank 21 contained both petroleum contaminated water and jet fuel, and sometimes he would remove the petroleum contaminated water from tank 21, and sometimes he would remove the jet fuel. It is also obvious that Mitch Oceguera understood the distinction between the jet fuel and the petroleum contaminated water in tank 21 because, as Sehneir explained, Mitch Oceguera would hook up to the higher narrower line in the back of tank 21 to remove the pure jet fuel located at the top of the tank, and he would hook up to the lower wider line in the front of the tank to remove the petroleum contaminated water. And, whereas Mitch Oceguera would unload the petroleum contaminated water into the regular tanks at CBI, he would unload the jet fuel into tank 7 at CBI. Tank 7 was the only tank at CBI that was locked, and it was Smith who had control over tank 7, not Mr. Miranda, the supervisor at CBI who was responsible for all of the material that was transported to and from CBI.
Because the terms in the contracts were either defined or commonly used and understood in the industry, and the defendants demonstrated they knew the difference between jet fuel and petroleum contaminated water, the contracts were not “evidence” of the defendants’ good faith in presenting invoices to the Aviation *433 Department classifying both the jet fuel and the petroleum contaminated water as petroleum contaminated water.
(5) The defendants treated petroleum contaminated water and jet fuel very differently
The contracts do not constitute evidence of the defendants’ good faith confusion between petroleum contaminated water and jet fuel simply because petroleum contaminated water was not defined, since the defendants treated them differently. Smith specifically directed Mitch Oceguera to pick up jet fuel or petroleum contaminated water at the fuel farm, and when Smith instructed Mitch Oceguera to pick up jet fuel from tank 21, he would hook up to the fuel line at the top of tank 21 and load up his tanker with jet fuel. He would then off load the jet fuel into the jet fuel tank, tank 7, at CBI, which Smith kept under lock and key. Smith would sell the jet fuel in tank 7 to Luis Costa, off the books and at 10$ to 15<t below the regular price of fuel, which Costa sold to freighters on the Miami River.
On the other hand, when Smith instructed Mitch Oceguera to pick up the petroleum contaminated water from tank 21, or the jet fuel was too low in tank 21 to siphon it out from the top line, Mitch Oceguera would remove the petroleum contaminated water from the line at the bottom of the tank until he hit the jet fuel. When he hit the jet fuel, he would turn off the valve, transport the petroleum contaminated water to CBI, and place it in any tank other than tank 7 to be treated.
Tank 7, which was completely controlled by Smith, was a “rogue” tank at CBI. CBI is a water treatment facility. Donna Hourigan, CBI’s comptroller did not know of tank 7’s existence, did not document jet fuel as an asset of the company, and was not aware that jet fuel was being stored and sold from the CBI facility.
In summary, the defendants presented no evidence to warrant a good faith jury instruction. The defendants did not testify that they were confused. Mitch Oceguera did not testify that CBI or Smith were confused. Mitch Oceguera was simply an employee doing what he was instructed to do. Smith and Schneir told him what to pick up at the fuel farm, and Smith directed him to unload the jet fuel he picked up at the fuel farm into tank 7 and the petroleum contaminated water into the water tanks at CBI. While it appears that Mitch Oceguera was not aware that Smith and CBI were stealing jet fuel from the Aviation Department, his knowledge, intent, or “good faith” was not at issue and shed no light on the defendants’ knowledge, intent, or “good faith.” The contracts between CBI and the Aviation Department are not evidence of the defendants’ “good faith” confusion because: (1) the contracts were drafted by CBI, and signed by Smith; (2) the contracts differentiated between petroleum contaminated water, contaminated jet fuel, and non-contaminated jet fuel; (3) the terms contaminated and non-contaminated jet fuel were clearly defined; (4) the terms are commonly used and understood in the industry; (5) the evidence established that the defendants understood the difference between petroleum contaminated water and jet fuel as they treated the two very differently; (6) the majority of the jet fuel stolen by the defendants was pure jet fuel (Jet A Fuel Non-contaminated) which came directly from the inbound and outbound fuel lines and jet fuel tanks and that term was clearly defined in the contracts; and (7) it defies common sense that if the defendants truly believed that everything they removed from tank 21 was petroleum contaminated water, they would be willing to pay the defendants 80$ a gallon as a kick *434 back, and lose 17c a gallon for each gallon they removed from tank 21, because the Aviation Department was only paying them 13c a gallon for petroleum contaminated water. Obviously the defendants were not paying 30c a gallon for contaminated water. They were paying Schneir and Caride 30c a gallon for jet fuel, which they later sold on the black market.
The case law relied on by the majority also does not support its conclusion that the failure to give the requested good faith instruction was error. In Stephens, the Florida Supreme Court held that:
In order to be entitled to a special jury instruction, [the defendant] must prove: (1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing.
Stephens, 787 So.2d at 756 (footnotes omitted). The Florida Supreme Court affirmed Stephens’ convictions, finding that the trial court did not err in failing to give the requested instruction because, although Stephens testified and the requested special instruction supported his theory of defense, he failed to establish that the special instruction was necessary and unlikely to confuse the jury. Id. at 757.
State v. Weller, 590 So.2d 923 (Fla.1991), cited by the majority, does not apply. Weller, who was charged with trafficking and conspiracy to traffic in cocaine, presented evidence to support an entrapment defense, and the jury was given the standard entrapment defense instruction. The issue was whether the trial court erred in limiting the entrapment defense to the trafficking charge and not instructing the jury that entrapment was also a defense to the conspiracy count. The Florida Supreme Court found that because entrapment was a defense to trafficking, it was also a defense to conspiracy to traffic. Weller, 590 So.2d at 927. In the instant case, the defense was “good faith,” not entrapment; the defendants requested a special instruction, not the standard instruction; and the defendants’ requested special instruction was false, misleading, and confusing.
Likewise, the majority’s reliance on Gardner v. State, 480 So.2d 91 (Fla.1985), for the general proposition that a defendant is entitled to have the jury instructed on the law applicable to his theory of defense, provides us with no insight regarding the instant case. In Gardner, the defense was voluntary intoxication, not “good faith”; Gardner presented evidence of his intoxication; and he requested that the standard voluntary intoxication instruction be given. Gardner’s accomplice testified as to Gardner’s consumption of alcohol and marijuana on the day he committed the crimes, and a separate witness testified that shortly after the crimes were committed, Gardner’s “eyes looked high.” Gardner, 480 So.2d at 93. Unlike Gardner, the defendants in the instant case requested a special instruction, not a standard instruction, the requested special instruction was false, misleading, and confusing, and while Gardner presented evidence of his intoxication, the defendants in the instant case presented no evidence of their “good faith.” Id.; see also Durie v. State, 751 So.2d 685, 690 (Fla. 5th DCA 2000) (finding no error in the failure to give the defendant’s requested good faith jury instruction because the defendant’s mistake as to the law was not a defense to grand theft and his actions were inconsistent with honest conduct).
Rodriguez v. State, 396 So.2d 798 (Fla. 3d DCA 1981), another case relied on by the majority, is, however, instructive. Similar to the defendants, Rodriguez was charged with grand theft and he requested *435 a “good faith” special instruction. However, the critical difference between Rodriguez and the instant case is that Rodriguez testified, whereas the defendants in the instant case did not. Rodriguez and his wife testified that they believed the money they retained as managers of a motel was rightfully theirs under the compensation agreement they had entered into with the owner of the motel. Id. at 799. The defendants in the instant case did not testify or present any evidence that they were confused or believed they could invoice the jet fuel in tank 21 as petroleum contaminated water. And, of course, their actions established evidence to the contrary, including no explanation was given for the pure jet fuel stolen from the jet fuel lines and jet fuel tanks, which they failed to invoice at all.
This Court’s opinion in Dreisch v. State, 436 So.2d 1051, 1052 (Fla. 3d DCA 1983), is also instructive, as Dreisch was charged with grand theft and he requested a good faith instruction in support of his theory of defense. This Court found no error in the trial court’s refusal to give the instruction because there was no evidence that he had an honest belief that he had a right to the property in question. Id. (distinguishing Rodriguez where the defendant testified and offered evidence of his good faith belief).
In the following cases relied on by the majority, failure to instruct the jury regarding his theory of defense was found to be error, but in each case the defendant testified and offered evidence as to his theory of defense. Mathis v. State, 973 So.2d 1153, 1157 (Fla. 1st DCA 2006) (finding that a self-defense instruction was required based on facts including the defendant’s testimony that the victim was the aggressor and he was simply defending himself); Chavers v. State, 901 So.2d 409, 411 (Fla. 1st DCA 2005) (holding the lower court erred in failing to give the requested instruction in a self-defense case where the defendant testified that he suffered from a nervous condition and that he reacted out of fear for his own safety); Owens v. State, 866 So.2d 129, 131-32 (Fla. 5th DCA 2004) (finding that defendant’s trial counsel provided ineffective assistance of counsel by failing to properly request a good faith special instruction where the defendant testified in his own behalf that he had a good faith belief that the owner of the property had authorized him to take possession of it); Evans v. State, 831 So.2d 808, 810-11 (Fla. 4th DCA 2002) (finding the evidence required the requested instruction where the testimony of the defendant and his family members supported the defendant’s theory of defense); Philippoussi v. State, 691 So.2d 511, 512 (Fla. 4th DCA 1997) (finding that the defendant, who was charged with taking advantage of an elderly woman after being added as a signatory on the woman’s bank accounts by removing funds from the account, was entitled to a non-defective good faith instruction where the evidence showed that the defendant offered evidence of her close relationship with the woman, who had previously made the defendant the co-owner of two other substantial bank accounts, and witnesses testified that the woman considered the defendant the daughter the woman never had); see also Verdult v. State, 645 So.2d 530, 530 (Fla. 4th DCA 1994) (finding that the evidence warranted giving the defendant’s requested good faith instruction, but failing to articulate what evidence was presented or whether or not the defendant testified); Dudley v. State, 405 So.2d 304, 305-06 (Fla. 4th DCA 1981) (concluding that, although the defendant did not testify, because the testimony of the defendant’s business associate established sufficient evidence of the defendant’s good faith, the defendant was enti- *436 tied to a jury instruction regarding his good faith defense).
The majority notes that the information, jury instructions, and verdict form did not distinguish or otherwise separate the thefts of jet fuel. I agree. In fact, it is this fact which requires affirmance of the defendants’ convictions. Because the thefts of jet fuel were consolidated, and good faith is not a defense to the pure jet fuel stolen directly from the inbound and outbound jet fuel lines and from the jet fuel storage tanks, to give the requested jury instruction — that good faith is a complete defense to the charges — would clearly have been error. With all due respect, the defendants’ arguments, which the majority found persuasive, regarding interpretation of the contract and the defendants’ good faith are a red herring in this case. Most of the fuel stolen came directly from the inbound and outbound pure jet fuel lines and from the pure jet fuel being stored in the fuel tanks. If the defendants “mistakenly” invoiced the contaminated jet fuel removed from tank 21 as petroleum contaminated water, the result would be the same, as they stole outright hundreds of thousands of gallons of pure jet fuel, far in excess of the statutory requirement to prove grand theft in the first degree, for which they offered no defense, and they submitted-invoices for the removal of petroleum contaminated water that were completely fictitious.
THE DISCOVERY ISSUE
Post-trial, when the issue of whether there had been a discovery violation was first raised, the trial court conducted a hearing and concluded that: (1) there had been no discovery violation; (2) the defense waived the issue by waiting as long as it did; (3) the untimely objection failed to put the court on notice to conduct a Richardson hearing; and (4) the defendants were not procedurally prejudiced. We review these findings for abuse of discretion. See Pender v. State, 700 So.2d 664, 667 (Fla.1997); Consalvo v. State, 697 So.2d 805 (Fla.1996).
Without addressing our standard of review or the trial court’s specific factual findings, the majority concludes that “the trial court’s failure to conduct a timely and adequate Richardson hearing” is reversible error. Because the record supports the trial court’s findings, it is error to reverse on this ground, and I respectfully dissent.
The record reflects that the defendants failed to: (1) timely object when they were put on notice by the State that the witness’ testimony was going to differ from his prior sworn statements; (2) allege a discovery violation; (3) request a Richardson hearing; or (4) ask for any affirmative relief at any time during the trial. Thus, the trial court’s order is supported by the record and the trial court did not err in failing to conduct a Richardson hearing when the alleged violation occurred. The record also reflects that the trial court did conduct a Richardson hearing post-trial when the defendants first alleged in their motion for a new trial that a discovery violation had occurred. The trial court found that no discovery violation had occurred and that even if there had been a discovery violation, the defendants were not procedurally prejudiced. Because the trial court conducted a sufficient inquiry when the objection was raised and the record supports the trial court’s findings, no abuse of discretion has been shown, and reversal on this ground is error.
A. The Defense Failed to Timely Object
“A Richardson inquiry is necessary only when there is a discovery violation and an objection based on the alleged violation.” Bush v. State, 461 So.2d 936, 938 (Fla. *437 1984) (emphasis added); Lucas v. State, 376 So.2d 1149, 1151 (Fla.1979); Richardson v. State, 246 So.2d 771 (Fla.1971). Generally, “to raise a claimed error on appeal, a litigant must object at trial when the alleged error occurs.” F.B. v. State, 852 So.2d 226, 229 (Fla.2003) (emphasis added). The requirement that the specific objection be timely made is based on basic fairness as it permits the trial court to correct the error early in the proceedings.
The requirement of a contemporaneous objection is based on practical necessity and basic fairness in the operation of a judicial system. It places the trial judge on notice that error may have been committed, and provides him an opportunity to correct it at an early stage of the proceedings. Delay and an unnecessary use of the appellate process result from a failure to cure early that which must be cured eventually.
Castor v. State, 365 So.2d 701, 703 (Fla.1978).
Contrary to the majority’s repeated representations that the State violated its discovery obligations by failing to disclose changes to Schneir’s testimony, the undisputed evidence reflects that the State made a full disclosure of these changes to defense counsel. The record further reflects that the State was unaware prior to trial that Schneir’s trial testimony would differ from his prior sworn statements. It is undisputed that during the trial and just prior to Schneir’s trial testimony, Schneir admitted to the prosecutor that he had tried to minimize his involvement and intended to “come clean” at trial, and the prosecutor relayed that information to counsel for the defendants. The prosecutor testified that he told Mr. Pasano, Smith’s trial counsel, “exactly what Mr. Schneir was going to testify.” The prosecutor further testified: “I told him what Mr. Schneir was going to testify to and I told him the dates. I told him he pushed it back from the number of times and I think I actually told [him] money too.” Although the prosecutor contends the disclosure was made just prior to Schneir’s testimony, and Mr. Pasano believes it was made during Schneir’s testimony, Mr. Pa-sano agreed during a post-trial hearing that the disclosure was made on the morning of November 26, 2008, when Schneir first began to testify. Thus, the majority’s statements to the contrary are incorrect.
Despite the State’s disclosure, defense counsel raised no objection; made no further inquiry; did not bring the matter to the trial court’s attention; did not request to re-depose or speak with Schneir; did not seek a continuance; and did not request a Richardson hearing. Defense counsel admits that he did not request a Richardson hearing, and the record reflects that defense counsel sat mute and failed to object throughout Schneir’s testimony on Wednesday, November 26, 2008, when Schneir testified at least nine times that Smith began stealing jet fuel from the fuel farm in 2000, rather than in 2001 as Schneir had stated in his prior sworn statements, and Schneir explained how each theft was made.
It is therefore clear that no contemporaneous or timely objection was made, and the trial court’s finding that the issue was waived “by virtue of waiting as long as the defense waited” is supported by the record.
B. The Defense Failed to Put the Trial Court on Sufficient Notice to Conduct a Richardson Hearing
As previously stated, Schneir’s testimony on Wednesday, November 26, 2008, went unchallenged by the defense, despite the numerous times Schneir testified that the thefts began in 2001, not 2000 as he contended in prior sworn statements. The *438 record reflects, however, that after the trial court excused the jury and recessed the trial until the following week, counsel for the defense did ask the trial court to inquire of the State whether it had complied with its obligation under Brady (to provide all exculpatory evidence to the defense).
[COUNSEL FOR SMITH]: Judge, one request before we break, it’s through the Court to the prosecutors. ...
Apparently now, with Mr. Sehneir’s testimony and questions, it’s clear that Mr. Schneir[’s] testimony is at odds with both his sworn [statement] in May to the prosecutors, and his deposition in June.
And I’m asking if there are other statements, interviews or notes that occurred since that time, that are inconsistent with his prior testimony, that under Brady, that they be produced.
[[Image here]]
THE COURT: So, you’re invoking Brady, and I’m assuming, Mr. Scruggs, you’re aware of that, and anything they are entitled to, you have turned over?
[ASA]: I have certainly heard of that obligation, Judge, and had — if I had any such reports or anything, they would have gotten them a long time ago.
[[Image here]]
[COUNSEL FOR SMITH]: It’s clear from the question asked about dates and how he lied and all the meetings about dates, that Mr. Scruggs, before he asked these questions, knew that the testimony was going to vary from the sworn testimony previously given.
I believe that the oral statements have been made to Mr. Scruggs or to Mr. Fiedler that are inconsistent, that is within the obligation the prosecutor owes, and I cannot believe that Mr. Scruggs asked the questions, and is surprised to hear that now the witness is testifying in variance.
So I think there are statements out there, with all respect to Mr. Scruggs that Mr. Scruggs knows perfectly well and I ask for them now.
THE COURT: Okay. Is there anything, Mr. Scruggs, and if there’s anything you haven’t disclosed, whether it’s oral or written, certainly you will?
[ASA]: I don’t have any issue with that. No problem.
THE COURT: I have no doubt that if anything occurs to you over the weekend, obviously, that you have not thought about or turned over — [At this point, defense counsel interrupted the trial court and moved on to a different issue].
As this record demonstrates, defense counsel did not object to the change in Schneir’s testimony; did not seek to re-depose or speak to Schneir outside the presence of the jury, even though the trial was not set to resume until the following week; did not request a continuance; and did not request that the trial court conduct a Richardson hearing. Instead, defense counsel merely asked if there was any Brady evidence not provided to the defense. In response, the trial court told the State to disclose any undisclosed statements, if any, and the court was recessed. Upon return one week later, and clearly after full disclosure had been made the preceding week, the defense continued to raise no objection when Schneir testified at least eight more times during direct examination or at any time during the State’s direct examination of the witness, that the thefts began in 2000, not 2001.
The majority concedes that the inquiry requested by defense counsel on November 26, 2008, was whether the State had complied with its obligations under Brady, and the record reflects that the trial court *439 immediately made the Brady inquiry requested. The majority also concedes that Schneir’s changed testimony “is not Brady material” because it was incriminating evidence, not exculpatory evidence. Despite these circumstances, the majority concludes that the trial court erred in failing to conduct a Richardson hearing. The majority is incorrect.
The majority ignores the record and the language of defense counsel’s inquiry; defense counsel’s admission that he did not request a Richardson hearing; and that when the inquiry was made, the State had already disclosed the changes in Schneir’s testimony to defense counsel. The language of the inquiry reflects that defense counsel was not lodging an objection to the changed testimony, not alleging a violation, nor requesting that the trial court conduct a Richardson hearing. The only thing requested by defense counsel was that if there were any other “statements out there,” they be disclosed, to which the State agreed. Because no objection was made; the trial court conducted the inquiry requested; and the defense did not put the trial court on notice that any further inquiry was necessary or seek any other affirmative relief, the trial court did not err in failing to conduct a Richardson hearing at that time.
Although defense counsel admitted that he did not request a Richardson hearing, the majority concludes that the defense put the trial court on sufficient notice to require that a Richardson hearing be conducted. The trial court, however, specifically found that the inquiry requested by the defense did not put it on notice that the defense was alleging a discovery violation, requesting a Richardson hearing, or objecting to the testimony. And, while I agree that there are no “magic words” that must be used to necessitate an inquiry, the law does not expect or require the trial court to be a mind reader.
In Major v. State, 979 So.2d 243, 244-45 (Fla. 3d DCA 2007), this Court found that because defense counsel did not timely object to the existence of a possible discovery violation or request a Richardson hearing upon learning of Dr. Shuman’s changed testimony during his direct examination, choosing instead to impeach him with his inconsistent statements, the issue was not preserved for appellate review. Specifically, this Court held that the failure to conduct a Richardson hearing where defense counsel never presented the trial court with an objection on the basis of a discovery violation or requested a Richardson hearing, choosing instead to impeach the witness with his inconsistent testimony “was hardly ... adequate notice of a discovery violation which might have obligated [the trial court] to conduct a further inquiry.” Major, 979 So.2d at 245.
Similarly, in Lucas v. State, 376 So.2d 1149, 1151-52 (Fla.1979), the Florida Supreme Court concluded that, although defense counsel brought the State’s noncompliance with its discovery obligations pursuant to rule 3.220 to the court’s attention when the State called a rebuttal witness not listed in discovery, because defense counsel failed to interpose a timely objection, the trial court was not required to conduct a Richardson hearing.
It is clear from the record in this case that the state failed to comply with Rule 3.220. It is also clear that the trial judge allowed the undisclosed witness to testify without a Richardson inquiry into the surrounding circumstances of the state’s non-compliance. On these points, appellant’s argument is well taken. However, one essential ingredient is missing. Since the state’s non-compliance with Rule 3.220 does not require automatic reversal, it was incumbent *440 upon the appellant to raise a timely objection and thereby allow the trial court to specifically rule on the issue. The record shows that while defense counsel brought the state’s non-compliance to the attention of the court, he did not interpose an objection; but rather, he deferred to the trial court’s statement of the applicable law. This court will not indulge in the presumption that the trial judge would have made an erroneous ruling had an objection been made and authorities cited contrary to his understanding of the law. Under the circumstances, the trial judge was not required to make further inquiry.
Lucas, 376 So.2d 1151-52 (emphasis added).
This Court also concluded in Simon v. State, 615 So.2d 236, 237 (Fla. 3d DCA 1993), that the trial court did not err by failing to conduct a Richardson hearing where the defendant faded to object while the witness was testifying, and the co-defendant, who did object, did not object on the ground of a discovery violation. This Court specifically found that “[ujnder these circumstances, the defendant can hardly complain that the trial court erred in failing to conduct a Richardson hearing.” Simon, 615 So.2d at 237. Moreover, this Court found that a motion for mistrial later in the trial did not cure the defendant’s initial failure to object to the evidence or request a Richardson hearing when the evidence was introduced. Id.
Similarly, in Taylor v. State, 589 So.2d 918, 919 (Fla. 4th DCA 1991), the Fourth District, relying on the language already quoted in this dissent from the Florida Supreme Court’s opinion in Lucas, found that where defense counsel failed to object to the witness’ testimony or request a Richardson hearing, the Richardson hearing was waived.
As in Lucas, Major, Simon, and Taylor, defense counsel in the instant case failed to object or request a Richardson inquiry. Thus, the trial court was not put on notice that the defense had an objection to the testimony, nor was the trial court given an opportunity to rule on the “objection” and cure any potential prejudice to the defendant. As the Florida Supreme Court stated in Lucas, this Court should “not indulge in the presumption that the trial judge would have made an erroneous ruling had an objection been made and authorities cited contrary to his understanding of the law.” Lucas, 376 So.2d at 1152.
C. The Trial Court’s Failure to Conduct a Richardson Hearing During Trial was Harmless Error.
The majority concedes that the trial court conducted a Richardson hearing post-trial but concludes that the hearing was untimely and inadequate. The majority is incorrect.
First, the hearing conducted by the trial court was timely. Although the State disclosed the changes to Schneir’s testimony during trial, the defense did not object or request a Richardson hearing during trial. Thus, the hearing which was conducted post-trial, when the issue was raised in the defendants’ motion for a new trial, was timely held.
Second, the inquiry was adequate where the trial court inquired as to the circumstances of the discovery violation and determined whether the defendants were procedurally prejudiced. See State v. Hall, 509 So.2d 1093, 1097 (Fla.1987) (concluding that the trial court satisfied the minimum requirements of Richardson by inquiring into the circumstances surrounding the alleged discovery violations and the prejudice to the defense).
Third, even if the inquiry was inadequate, an inadequate Richardson inquiry *441 does not require reversal if the error was harmless. See State v. Schopp, 658 So.2d 1016, 1021 (Fla.1995) (applying the harmless error analysis where the trial court fails to conduct or conducts an inadequate Richardson hearing).
Application of a harmless error analysis in this context will result in reversal where the record will not support a finding that the unsanctioned discovery violation could not have materially hindered the defense. However, where, as here, the appellate court truly can rule the error harmless, there will be no need to order a new trial.
Id. at 1020; see also Pender, 700 So.2d at 665; Powell v. State, 912 So.2d 698, 701 (Fla. 2d DCA 2005) (“[W]hen a trial court fails to conduct an adequate Richardson hearing, the appellate court must apply a harmless error test that focuses on ‘whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defendant.’ ”) (quoting Schopp, 653 So.2d at 1020). Thus, in the absence of an inadequate inquiry, the record must be examined.
At a minimum, a Richardson inquiry must involve consideration as to: (1) whether the discovery violation was inadvertent or willful; (2) whether the violation was trivial or substantial; and (3) what effect the violation may have had on the defendant’s ability to prepare for trial. Schopp, 653 So.2d at 1020.
At the post-trial hearing, the trial court specifically inquired as to the reason for the State’s delayed discovery disclosure. The prosecutor explained that on the weekend prior to Schneir’s trial testimony, he met with Schneir and reminded him of his obligation under his plea agreement to testify truthfully. He also told Schneir that the numbers did not add up and he needed to tell the truth. The next day (approximately two days before he testified), Schneir notified the prosecutor that he had “minimized” what occurred, and the prosecutor told Schneir, “fine, ... I’m going to bring that up front and you’re going to admit to these folks that you committed perjury.” When asked why he did not immediately disclose the substance of this conversation to the defense, the prosecutor explained that in his mind, because the evidence was not exculpatory, he was not required to disclose it under Brady, and because the defense had all of Schneir’s prior statements, and the evidence was impeachment evidence, he did not think he had an obligation to disclose it.
While the prosecutor was incorrect about his duty to disclose changes in a witness’ testimony, see Scipio v. State, 928 So.2d 1138, 1142 (Fla.2006) (concluding that the State has an obligation under Florida Rule of Criminal Procedure 3.220(j) to disclose any material change in a witness’ statement), the record reflects that the discovery violation was not willful. The record also reflects that the violation was minimal. This was not a situation where the State learned prior to trial that Schneir intended to change his testimony and the failure to disclose this information could have affected defense counsel’s trial strategy. Here, the witness decided to “come clean” while the trial was in progress and within a day or two of his testimony. Because the delay in the State’s disclosure to the defense was minimal, it only affected the ability of defense counsel to prepare for cross-examination of the witness. The defense, however, had eight days between the disclosure and cross-examination to prepare for its cross-examination of Schneir, and it had all of the impeachment materials in its possession. Additionally, since the defense was that no thefts occurred, the expansion of time in which the thefts occurred and the two- *442 day delay in disclosure was not substantial under these circumstances.
The trial court also found that the defendants were not prejudiced because Schneir’s trial testimony did not differ from that of the other witnesses; the amount of fuel stolen was so large that Schneir’s expansion of the date the thefts began did not materially affect the case; and the side actually prejudiced was the State because Schneir was repeatedly impeached and he admitted to being a liar.
Frankly, the Richardson issue is a red herring and the majority’s reliance on this argument ignores the lengthy, but informative, record in this case. The argument is that the defense was procedurally prejudiced by the two-day delay in disclosure of Schneir’s expansion of his original testimony (an expansion of the starting date of Smith’s criminal enterprise and the number of gallons of jet fuel Smith stole). The record reflects the following.
First, the charging document clearly charged Smith with committing these offenses (theft and organized scheme to defraud) from January, 2000 to March, 2003. Thus, the defense was put on notice what it was defending.
Second, defense counsel admitted that, although Schneir minimized the duration of the thefts in his pre-trial statements, there were other witnesses, including Car-ide, who testified in sworn pretrial statements, that the thefts began in January of 2000. Thus, the only effect Schneir’s changed testimony could have had was on defense counsel’s inability to discredit the witnesses’ testimony by showing that they conflicted. However, the record reflects that the State did not call any of these other witnesses, so this potential “benefit” did not present itself. More importantly, because Schneir did not change his testimony until the trial was already underway, the two-day delay in reporting could not have affected defense counsel’s pre-trial preparation.
Third, a review of the depositions reflects that the beginning date of Smith’s criminal enterprise and the amount of jet fuel stolen were not material to the defense of the charges. Smith’s defense in this case was that no thefts had occurred — no jet fuel was stolen, no jet fuel was manifested as petroleum contaminated water, and no bogus manifests were submitted. Thus, to suggest that a two-day delay in reporting, after trial had already commenced, that Schneir had expanded his testimony prejudiced the defendant, and requires a new trial, ignores the record. The depositions clearly reflect that the questioning focused on how the thefts occurred and the involvement of each of the various co-defendants, not on when the criminal enterprise began.
Fourth, the record does not support the majority’s attempt to establish prejudice by its computation of Schneir’s expansion of his pre-trial testimony. The majority incorrectly states that the variance in Schneir’s pre-trial and trial testimony was two-and-one-half-years, and extrapolates from this incorrect conclusion.
Because the majority’s premise is incorrect, so too are its computations. The majority contends that Schneir’s testimony changed from claiming that the criminal enterprise began in June 2002 (and concluding in March of 2003, which did not change), to beginning in early 2000. However, Schneir’s pre-trial sworn statement reflects as follows:
Q: Now sometimes Jeff would call you and ask you for fuel; is that correct?
A: That is correct.
Q: Approximately how many times would that happen?
A: A time period, from '01 to '03, I would say probably a dozen times.
*443 [[Image here]]
Q: How much did, if you can, approximately how many times did they take fuel over this time period? If you can [sic] me up with a number. If you can’t, don’t do it.
A: No. I don’t really know.
Q: It would be numerous times?
A: From 2001 and 2003, yes.
Q: How much did they pay?
A: 30 cents.
[[Image here]]
A: We got paid at the end of the month for everything, for the fuel and the water.
[[Image here]]
Q: How many times did that happen approximately?
A: I would also say in that time frame, maybe two dozen times in that time frame, from 2001 to 2003.
Q: So it was fairly frequently. I guess? More than a few times?
A: Yes. I figured it was out of 12 months a year I figured probably around seven, eight months.
[[Image here]]
Q: From the time period that we have been talking about, which, you know, I mentioned 2000, but I guess we will use that arbitrary date. From roughly 2000 to 2003, approximately how much money did you get from all these schemes?
[[Image here]]
A: Approximately [$]200,000.
When Schneir was deposed by the lawyers representing the various defendants charged, Mr. Goodman, on behalf of CBI, asked him the following:
Q: The $200,000 approximately that you say you obtained in illegal money at the airport, over what period of time are we talking about?
A: From 2001 to 2003
[[Image here]]
Q: Do you have a sense as to the starting time, whether it was at the beginning of 2001 as compared to the end of 2001?
A: I would say near the beginning. Again, I’m not sure.
Neither Mr. Quinon, on behalf of Cliff Berry, nor Mr. Pasano, on behalf of Smith, asked Schneir to provide any date as to Smith’s involvement.
A trial court’s ruling after conducting a Richardson hearing is subject to reversal only upon a showing that it was an abuse of discretion. Cox v. State, 819 So.2d 705, 712 (Fla.2002). No abuse of discretion has been shown as the record supports each of the trial court’s findings. Although Schneir testified in deposition that the fuel thefts began in early 2001, other witnesses testified that the thefts began in 1999 and 2000, and the information alleged that the fuel thefts began in 2000. Thus, the defense cannot claim surprise or that it was prejudiced when Schneir’s testimony simply conformed to that of the charging document and other pre-trial witness testimony.
“[T]he key question in a situation in which a discovery violation is alleged is whether or not the defendant was significantly prejudiced by the state’s failure to produce the requested evidence.” State v. Randol, 947 So.2d 609, 614 (Fla. 3d DCA 2007) (quoting Jones v. State, 360 So.2d 1293, 1296 (Fla. 3d DCA 1978)). “Prejudice in this context means the discovery violation must prevent the defendant from properly preparing for trial,” Randol, 947 So.2d at 613 (citing Scipio, 928 So.2d at 1147), or in this case, from preparing for his cross-examination of Schneir.
In Smith v. State, 7 So.3d 473, 506-07 (Fla.2009), the Florida Supreme Court concluded that, although the State commit *444 ted a discovery violation by failing to disclose Walker’s recantation of his deposition testimony and the trial court erred in failing to conduct a Richardson hearing, the defendant was not procedurally prejudiced. Thus, the Court affirmed Smith’s convictions for four counts of first degree murder, two counts of manslaughter, and other offenses. The Florida Supreme Court found that even if the defense had known “that Walker was not going to testify consistent with his deposition but in line with [the other] witnesses ... the defense would not have devised a different trial strategy.” Smith, 7 So.3d at 507. Similarly, in the instant case, the witness did not disclose to the State that he intended to alter his testimony until the trial was already well underway. Although the prosecutor delayed relaying this information to the defense for approximately two days, there is no reasonable doubt that the defendants were not procedurally prejudiced by this two-day delay because: the testimony was in line with the pre-trial testimony of other witnesses and the charging document; the testimony simply expanded the duration of the ongoing theft and scheme to defraud; and the defense was that the witnesses were all lying because the defendants did not steal any fuel.
What is important to remember, and what the majority completely ignores, is that Schneir did not change his testimony prior to trial. Schneir decided to “come clean” during the trial just prior to his testimony, and the discovery violation in this case is the failure to disclose this information to the defense until approximately two days later when Schneir testified. Thus, the only possible prejudice would be defense counsel’s inability to effectively impeach Schneir during cross-examination.
The trial court found that the defense was not procedurally prejudiced and that the only one prejudiced was the State because its witness admitted to being a liar and providing perjured testimony, and was impeached repeatedly and aggressively throughout his testimony due to the changes he made to his testimony. Because the record supports this finding, no abuse of discretion has been shown, and we must affirm. Cox, 819 So.2d at 712. The disclosure occurred on Wednesday, November 26, 2006, prior to or early during Schneir’s direct examination. Schneir’s direct examination did not resume until one full week later on Wednesday, December 3, 2008, and cross-examination did not commence until after the lunch recess on December 3, and did not conclude until the afternoon of December 4. Despite the State’s full disclosure on November 26, the defense did not request a continuance, seek to re-depose Schneir, or object to his testimony. The defense had eight days to prepare for the changes to its cross-examination and impeachment of the witness, and the record reflects that the impeachment was aggressive and thorough. In fact, the defense was placed in a far better position than most lawyers who must cross-examine witnesses who change their testimony with no warning. Thus, based on the record in this case, the failure to disclose the change in Schneir’s testimony sooner was harmless beyond a reasonable doubt. Schopp, 653 So.2d at 1021 (holding that even if the officer had been listed and deposed, there would have been nothing in his testimony that could have supported a different strategy than the one taken by defense counsel at trial).
To suggest that the defendant was procedurally prejudiced by a two-day delay in disclosing Schneir’s expansion of the starting date, is entirely without merit. Because the charging document clearly put the defendant and defense counsel on notice that the State intended to prove that Smith’s criminal enterprise began in Janu *445 ary of 2000; there were listed witnesses who gave pre-trial sworn statements and were prepared to testify consistent with the charging document; the depositions of Schneir reflect that defense counsel was not particularly interested in the specific date the criminal enterprise began nor in the specific number of gallons of jet fuel stolen; and the defense in this case was that Smith did not steal any fuel, to reverse on this ground, is equally without merit.
In conclusion, because the defendants failed to timely object or request a Richardson inquiry when they were put on notice by the State’s disclosure that the witness’ testimony was going to differ from his pre-trial statements, the trial court did not err in failing to conduct a Richardson hearing during trial. The trial court did, however, conduct a Richardson hearing post-trial when defense counsel first raised the issue, and concluded that there was no discovery violation as the State did disclose to the defense the changes to Schneir’s testimony and the only side prejudiced was the State. The transcript of the trial court’s inquiry also establishes that the discovery violation was not willful or substantial based on the circumstances. Because the record supports the trial court’s findings, no abuse of discretion can be shown. Additionally, because the defendants failed to timely object or request a Richardson hearing, reversal may only be granted upon a showing of fundamental error, which was not argued or established on appeal. Thus, to reverse the defendants’ convictions on the two grounds relied on by the majority is error.
For the reasons articulated in this dissent, I submit that the convictions on appeal should be affirmed.

.For purposes of sentencing, the State nolle prossed the two convictions for organized scheme to defraud and the defendants were sentenced on the grand theft counts.

. Richardson v. State, 246 So.2d 771 (Fla.1971).

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. The defendants’ proposed good faith instruction is as follows:
"Good faith” is a complete defense to the charges in the Information since good faith on the part of a defendant is inconsistent with intent to defraud or willfulness which is an essential part of these charges. The burden of proof is not on a defendant to prove his good faith, of course, since he has no burden to prove anything. The State must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the information.
One who expresses an honestly held opinion, or an honestly formed belief, is not chargeable with fraudulent intent even though the opinion is erroneous or the belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.
On the other hand, an honest belief on the part of a defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute “good faith” as that term is used in these instructions if, in carrying out that venture, the defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.

. The defendants' proposed instruction reads as follows: "A disagreement over the interpretation of a contract may result in a civil lawsuit but does not create criminal culpability. Likewise, the State cannot prove a criminal theft, fraud, or racketeering charge by merely showing that a defendant did not comply with his contractual obligations.”